# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

ZULAY RODRIGUEZ VELEZ; YOHAMA
GONZALEZ MILAN; LEILA G.
GINORIO CARRASQUILLO; AND
JULISSA PIÑERO,

    Plaintiffs,

                v.

HON. PEDRO R. PIERLUISI URRUTIA,
IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE
COMMONWEALTH OF PUERTO RICO,

    Defendant.

**Civil No. 21-1366 (PAD)**

JURY TRIAL DEMANDED

## Amended Complaint for Declaratory and Injunctive Relief

The plaintiffs, Zulay Rodriguez Velez, Yohama Gonzalez, Leila G. Ginorio Carrasquillo, and Julissa Piñero, respectfully submit this amended complaint for declaratory and injunctive relief arising under the Fourteenth Amendment, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-§ 3 2000bb, the Food and Drug Administration's Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3, as well as pendent claims under the Constitution of the Commonwealth of Puerto Rico, P.R. Const. Art. II, §§ 1; 8, against the defendant, Hon. Pedro R. Pierluisi Urrutia, in his official capacity as governor of the Commonwealth of Puerto Rico.

**Introduction**

1. This Section 1983 action challenges the constitutionality of the Commonwealth of Puerto Rico's vaccine mandate as described in Executive Order No. 2021–058 ("Vaccine Mandate"), which—along with the other rolling executive orders—is the most stringent in the Nation.

2. The plaintiffs, employees of agencies of the Puerto Rico Government, who, if allowed by their respective agencies, would be able to perform their jobs without being physically present at their respective offices, challenge the constitutionality of several sections of the Vaccine Mandate—*See official translation*, Exhibit No. 1—on its face, and as applied to them, under which all government employees are required to get a COVID-19 vaccine or submit to weekly testing, and other burdens and restrictions.

3. All the plaintiffs, as career employees for the Puerto Rico government, have a property interest in their positions, the performance of their duties, and their modest compensation. And, more importantly, they have a fundamental right to bodily integrity, autonomy, and medical choice under the Fourteenth Amendment. The violation of this fundamental right triggers not rational-basis scrutiny as in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), which was used as precedent for the infamous decision in *Buck v. Bell*, 274 U.S. 200 (1927) (upholding the involuntary sterilization of those with mental disabilities), but rather a strict constitutional scrutiny or, at the very least, a heightened scrutiny under which the burden shifts to the government to justify its mandate. Indeed, as Justice Gorsuch noted concurring

in *Roman Cath. Diocese of Brooklyn v. Cuomo*, "*Jacobson* pre-dated the modern tiers of scrutiny," 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). *See also id.* at 71 (also noting that, unlike here, "[t]he imposition on Mr. Jacobson's claimed right to bodily integrity, thus, was avoidable and relatively modest"). Before explaining why the Vaccine Mandate violates the plaintiffs' constitutional rights—not least because it is arbitrary and capricious and because the means the government is using are not "closely to drawn to avoid unnecessary abridgment of" the plaintiffs' rights, *McCutcheon v. Federal Election Commission*, 572 U.S. 185, 197 (2014)—a brief recounting of pertinent COVID statistics in Puerto Rico shows how the government, however well-intentioned, is amplifying the severity of the pandemic *in the Commonwealth*.

4.   Although institutional capacity is lower in Puerto Rico than in any mainland U.S. jurisdiction, the pandemic never jeopardized the normal operations of our health care system.

5.   Puerto Rico reached over 60% full vaccination by May 31, 2021. As of August 16, 2021, the Puerto Rio Department of Health reported that 68.1% of eligible recipients have been fully vaccinated and 78.4% of eligible recipients have received at least one dose. *See* COVID-19 EN CIFRAS EN PUERTO RICO, *Vacunación* (Aug. 16, 2021), https://covid19datos.salud.gov.pr/#vacunacion.

6.   From June 1, 2021, and up to August 12, 2021, there has been a daily average of the 7-day moving average of 135 confirmed cases. The data used to compute the daily average (hereinafter referred to as "*Data source*") came from the, Departamento de

Salud de Puerto Rico, COVID-19 EN CIFRAS EN PUERTO RICO, *Casos* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#casos.

7.   From June 15, 2021, when the first Delta-variant confirmed case was reported in Puerto Rico, and up to August 12, 2021, there has been a daily average of 7-day moving average of 157 confirmed cases. For the 11 months before that, July 1, 2020 to May 31, 2021, the daily average of the 7-day moving average was 341 confirmed cases. That is, with the Delta variant, there has been more than two times (2x) less of a daily average of confirmed cases. Put differently, the daily average of the 7-day moving average of confirmed cases has decreased by 216%, even since the advent of the Delta Variant. *Data Source*, COVID-19 EN CIFRAS EN PUERTO RICO, *Casos* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#casos.

8.   The daily average of Puerto Rico adult's hospitalizations due to COVID from June 1 through August 16, 2021, has been about 1.5% (106 hospital beds) with a 38.2% (2,691) daily average of unused beds. For the 10 months before that, August 1, 2020 to May 31, 2021, the maximum adult's hospital utilization due to COVID was 9.3% (649 beds) for one day, with the daily average utilization at 5.3% (366 beds) and the unused beds daily average at 41% (2,940). That is, even with the Delta variant, our daily average adult's hospital utilization is almost four times (4x) less than during the period of the pandemic without it. *Data source*, Departamento de Salud de Puerto Rico, COVID-19 EN CIFRAS EN PUERTO RICO, *Sistema de Salud* (Aug. 15, 2021), https://covid19datos.salud.gov.pr/#sistemas_salud.

9. In Puerto Rico, only 4.3% of the population has had a confirmed case of COVID. Of those, 4.39% have already recuperated and only 0.1% are active cases (0.085% have died related to COVID). *Data source*, Departamento de Salud de Puerto Rico, COVID-19 EN CIFRAS EN PUERTO RICO, *Casos, Defunciones* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#casos;https://covid19datos.salud.gov.pr/#defunciones.

10. . That means that 95.5% of the population has not had a confirmed case of COVID. Now with over 68.1% of the population fully vaccinated, 78.4% of it with at least one dose, and 80% of the most vulnerable (60+ years old) with at least one dose and 73% fully vaccinated, our healthcare system will not be stressed going forward. *Data source*, COVID-19 EN CIFRAS EN PUERTO RICO, *Vacunación* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#vacunacion.

11. Puerto Rico currently ranks 7th among the States and territories in percentage of total population fully vaccinated. CDC, COVID Data Tracker, COVID-19 Vaccinations in the United States, *Data Table for COVID-19 Vaccinations in the United States* (Aug. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-total.

12. The most recent study of "breakthrough" cases—people fully vaccinated getting COVID—covered 25 states. The reported cases, it found, were well below 1%, fluctuating between 0.01% in Connecticut to 0.29% in Alaska. Hospitalizations were 0.00% in California, Delaware, D.C., Indiana, New Jersey, New Mexico, Vermont, and

Virginia and 0.06% in Arkansas. And, according to that study, deaths were 0.00% in all but two reporting states, Arkansas, and Michigan, which were 0.01%. The unvaccinated represented more than 9 out of 10 cases, ranging from 94.1% in Arizona to 99.85% in Connecticut. Hospitalizations among the unvaccinated ranged from 95.02% in Alaska to 99.93% in New Jersey, while deaths ranged from 96.91% in Montana to 99.91% in New Jersey. Policy Watch, Kaiser Family Foundation, *COVID-19 Vaccine Breakthrough Cases: Data from the States* (July 30, 2021), https://www.kff.org/policy-watch/covid-19-vaccine-breakthrough-cases-data-from-the-states/.

13.  A CDC study adds that breakthrough cases are always expected, but now represent just 0.098% of those fully vaccinated. The upshot is that, of the 102,000 *not* vaccinated, 1.5% (1,603) were hospitalized and 0.4% (417) died. Among 102,000 vaccinated, only 100 (0.098%) presented symptoms, and there was only one death (0.00098%), the deceased having had previous chronic health issues). This is sound evidence that vaccinated people have little to fear from non-vaccinated people. Arielle Mitropoulos, *Symptomatic breakthrough COVID-19 infections rare, CDC data estimates*, ABC News (July 26, 2021), https://abcnews.go.com/US/symptomatic-breakthrough-covid-19-infections-rare-cdc-data/story?id=79048589.

14. As vaccination rates go higher and higher, the percentage of total cases among the vaccinated will naturally increase, but that, too, will not be an alarming eventuality

because the total rate of cases, hospitalizations, and deaths will go down the higher

the vaccination rate goes.

15. The Executive Order justifies its strong measures by referencing the "positivity rate,"

meaning that a high percentage of COVID tests are coming back positive. But this a

classic denominator problem: not that many Puerto Ricans are being tested—actually

75% less than on the mainland. Puerto Rico performs 75% less COVID testing per

100,000 people than the average total of tests in the mainland, and it ranks second to

last (ahead only of the U.S. Virgin Islands) in total tests performed per 100,000 people

among U.S. jurisdictions. The U.S. test rate is an amazing 158,684 per 100,000 people,

while Puerto Rico's is just 39,678 per 100,000 people. *See Data Table for Cumulative*

*COVID-19 Nucleic Acid Amplification Tests (NAATs) Performed per 100k by*

*State/Territory* (Aug. 15, 2021) https://covid.cdc.gov/covid-data-

tracker/#cases_testsper100k. The reason for our low amount of testing is quite simple:

too many obstacles and burdens (*e.g.*, medical referral, health insurance plan, $75

cost) and extremely limited to non-existent public testing facilities. *See* Medicina y

Salud Pública, Administración y Gerencia Medicina, *Abogan para que se elimine*

*requisito de referido en servicio de telemedicina y la prueba de COVID-19* (Nov. 12, 2020),

https://medicinaysaludpublica.com/noticias/administracion-y-gerencia-

medicina/abogan-para-que-se-elimine-requisito-de-referido-en-servicio-de-

telemedicina-y-la-prueba-de-covid-19/7244. COVID tests are not as readily available

in Puerto Rico as they are on the mainland. In other words, the government is using

its own lack of institutional capacity to justify imposing severe burdens on individuals.

16. The above facts show why the government is amplifying the pandemic's severity.

17. Moreover, the below facts demonstrate how the Puerto Rico government is being arbitrary and capricious in coercing and *deceiving* its public employees into getting vaccinated without any regard to their fundamental rights to personal autonomy, religious liberty, and medical decision making.

18. The Vaccine Mandate suffers from several infirmities. As a threshold matter, important provisions are vague. It applies, for instance, to all employees who "work in person," but fails to define what "work in person" means.

19. Put differently, the method used to determine whether an employee "works in person" is unclear. Does it mean an employee who must be physically present at a government facility with government staff around? Or does it also include those who work in the field, as does plaintiff Yohama González?

20. The Vaccine Mandate's so-called religious and medical exceptions are also vague; it is unclear whether these so-called exceptions are even real "exceptions."

21. The general rule in Section 1 of the Vaccine Mandate orders all public employees who "work in person" to have a first dose of the vaccine on or before August 16, 2021, and the second dose by September 30, 2021.

22. Section 2 contains the two so-called exceptions: (1) for employees "whose immune system is compromised, are allergic to vaccines, or have any other medical

contraindication to the receipt of a vaccine shall be exempt from being inoculated with the vaccine against COVID-19;" and (2) for those employees who refuse "on the basis of religious beliefs, provided that the vaccines are against the employee's religious observance." The first exception requires the employee to submit a certification from a local physician, while the second requires an affidavit signed by the employee and her spiritual leader. Even if an employee qualifies for an exception, the employee must submit to weekly COVID tests, at the employee's own expense.

23. But immediately below those provisions, in Section 3, titled "DENIAL OF VACCINATION," the Vaccine Mandate states, in pertinent part, without making any reference to exceptions, that "Any government employee to whom this Executive Order is applicable and who does not present their immunization certificate ('COVID-19 Vaccination Record Card')" or document proving that they have completed or started their vaccination process against COVID-19, must present, the very same "negative COVID-19 test result at the beginning of each week." Read literally, this means that an employee is required to submit an affidavit only if or she invokes a religious faith or a medical condition. If the employee doesn't invoke an exception, he or she may "work in person" by submitting to weekly COVID tests. This conclusion is reinforced by Special Normative Letter No. 2—2021, issued by the Administration and Transformation Office, the human resources department of the Puerto Rico Government, included as Exhibit No. 2. *Compare* § V (6—8), which applies to any government employee who fails to submit proof of vaccination, *with* §

VI (4), which applies only to those employees with medical or religious exceptions. Indeed, the Normative Letter clarifies that if an employee who refuses the vaccine for religious reasons is unable to obtain an affidavit from his or her spiritual leader, he or she is still eligible for, or required to comply with, the process in § V (6), which covers *any* government employee who fails to provide proof of vaccination.

24. The way that the Vaccine Mandate is drafted, coupled with the Governor's expressions to the public, suggest that either the government does not understand its own orders, or it is purposely deceiving public employees into believing that only if they have a medical condition or religious objection may they choose to submit to weekly COVID-19 tests instead of getting vaccinated. *See, e.g.,* Press Release by the Governor's Office, re: EO 2021-062, Exhibit No. 3 at 1 (referencing the "previous Executive Order against the COVID-19—i.e., the EO 2021-058—and noting that "the exceptions will be the persons with medical conditions . . . [and] persons who, for religious reasons decided not to get vaccinated . . .".)

25. The Vaccine Mandate has already been subject to different interpretations by different government agencies. For instance, plaintiff Julissa Piñero was told by her supervisor that a medical certificate from her physician or affidavit from her spiritual leader was required if she preferred submitting to weekly tests instead of getting vaccinated. On the other hand, the Human Resources Department of the Gaming Commission told plaintiff Yohama González that no affidavit was needed if she submitted the negative COVID-19 results on a weekly basis.

26. The inconsistent and sometimes contradictory way in which the Vaccine Mandate's demands have been publicized and rolled out across agencies contributes to the arbitrariness of the government action.

27. To the extent that medical certificates or affidavits are required only for those employees who invoke a medical or religious exception, respectively, the Vaccine Mandate discriminates against those with medical conditions and religious beliefs by imposing additional burdens.

28. If more were needed to demonstrate the government's arbitrary and capricious insistence on forcing public employees to submit to vaccination, the Puerto Rico Department of Justice seems to compel all of its employees, regardless of whether they "work in person" or remotely, to get vaccinated or submit to weekly COVID-19 tests at their own cost. *See* Exhibit No. 4, *Letter re: Implementation of the OE2021-058 in the Department of Justice and Notification of Special Normative Letter No. 2-2021 from the OATRH*, p. 3 § IV ("The telework authorization under the Telework Regulation of the Justice Department does not exempt the employees from complying with EO 2021-058, for which, even when the employee is authorized to provide service at a distance, he/she has to comply with the provisions of the Executive Order.")

29. The above litany of facts demonstrates that the Puerto Rico government is willing to do anything to force the plaintiffs, and other Puerto Ricans, even by deceit, into getting vaccinated, with little if any regard to their fundamental right to personal autonomy, religious beliefs, and medical choice.

30. Regardless of the employees' medical conditions, as detailed in the sections below, submitting to, and equally importantly, paying for weekly COVID-19 tests in Puerto Rico is a heavy burden. And there are less intrusive means that the government can implement to attain its objective of preventing the spread of COVID-19 in government facilities without unduly burdening the plaintiffs' constitutional rights.

31. For instance, the government could provide clear criteria to determine whether an employee must "work in person." Where, as here, the plaintiffs have the equipment necessary to work remotely, their duties allow them to do so, and they have worked remotely in the past without any indication that their performance has been affected, forcing them to submit to weekly tests at their own cost constitutes an undue burden. For public employees like the plaintiffs, who earn modest salaries, spending over $200 per month, minus a reduction in salary for any unpaid leave that may be required to obtain medical referrals and take tests, is a severe burden.

32. The plaintiffs should at the very least be provided some due process to determine whether they could satisfy all their employment duties working remotely before having to sacrifice their fundamental right to personal autonomy, bodily integrity, religious liberty, and medical choice.

33. And if the respective agency still insists that the employee must "work in person," the agency could provide the COVID-19 tests on site and at the agency's cost, which would reduce the burden on employees choosing to exercise constitutional rights.

34. At the very least, the employees should be provided with reimbursements for money spent taking the COVID-19 tests (including applicable insurance deductibles) and paid leave so that they can obtain the required medical referrals and take the tests during working hours without reduction in salary. On this front, note that few medical practitioners and laboratories offer services outside normal work hours.

35. For the reasons stated above and below, the Vaccinate Mandate violates the liberty protected by the Fourteenth Amendment and the Puerto Rico Constitution, both of which includes rights of personal autonomy and bodily integrity, and the right to reject medical treatment.

36. The Vaccine Mandate also violates the economic liberty protected by the Fourteenth Amendment and the Puerto Rico Constitution, both of which protect the right to earn an honest living and the latter of which considers a government job to be a property interest.

37. The Vaccine Mandate also violates RFRA.

38. The Vaccine Mandate is also preempted by the Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3, which explicitly states that anyone to whom the product is administered must be informed of the option to accept or to refuse it, as well as the alternatives to the product and the risks and benefits of receiving it. As a result, the Vaccine Mandate violates the Supremacy Clause of the U.S. Constitution.

**Jurisdiction and Venue**

39. This Court has jurisdiction over all claims under 28 U.S.C. §§ 1331 and 1343(a), and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

40. This Court also has specific personal jurisdiction over the defendant, as the event giving rise to the claims took place in this forum.

41. Venue is proper under 28 U.S.C. § 1391, because all parties reside in this District, and because a substantial part of the events prompting the claims occurred in this District.

**The Parties**

42. Plaintiff Zulay Rodriguez Velez (Ms. Rodríguez) is a resident of Arecibo, Puerto Rico, an office assistant who has been employed by the Puerto Rico Department of the Family for nine years. Ms. Rodríguez is a secretary, and her duties consist of processing purchases and obtain quotations for purchases, all of which can be performed remotely. Therefore, she could work remotely full-time. Indeed, at the beginning of the pandemic, Ms. Rodríguez was allowed to work remotely two out of five days of the week, and there was never any issue with the quality of her work. Ms. Rodríguez has not been vaccinated because (1) she understands that vaccination goes against her religious beliefs, but also (2) she is pregnant and is concerned that the effects of the vaccine on pregnant women and their babies has not been sufficiently studied, so does not trust any of the vaccines at this time.

43. Plaintiff Yohama González Milan is a supervisor of inspectors at the Gaming Commission of the Government of Puerto Rico.  Ms. González has worked at the

Gaming Commission since its creation and was formerly a career employee for the Puerto Rico Department of Tourism, Games of Chance division. Her position requires her to supervise inspectors at casinos throughout Puerto Rico. She goes to the office only to submit paperwork but could perform this task by leaving the paperwork in a mailbox.  Ms. González is a Christian of deep faith, pro-life, who does not believe in vaccination. She believes that her body is a temple, and she must take care of it through natural medicine. Indeed, the last time that she was vaccinated was in elementary school. Moreover, Ms. González also refuses to get vaccinated because all the available vaccines used fetal cell lines in either the development, production, or testing phases. Ms. González has contacted two physicians to try to obtain several postdated medical referrals for COVID-19 tests in advance to comply with the mandate without having to spend several hours each week to secure referral, but both physicians refused. The doctors told her that she would have to assist personally to their offices each week, and one of the doctors told her that she would provide one referral via email each week, but that González's insurance plan would not cover it.

44. Plaintiff Leila G. Ginorio has been working for the Puerto Rico Department of Labor since 1996. Currently, she works as a claims officer for unemployment benefits. Her duties consist of making telephone calls to interview unemployment benefits claimants to determine whether they are eligible to receive unemployment benefits. As a result, she could work remotely if the Department of Labor allowed it. Indeed, she worked remotely from March 2020 until April 2021 and there was never any issue

with the quality of her work. Ms. Ginorio refuses to get vaccinated because, among other things, she is pro-life, and all the available vaccines used fetal cell lines in either the development, production, or testing phases. Ms. Ginorio's spiritual leader, however, refuses to sign an affidavit for her to obtain the religious exception.

45. Plaintiff Julissa Piñero has been working for the Department of Public Security, ascribed to the Bureau of Emergency Medical Corps for 20 years. Currently, her duties consist of monitoring the assistance of employees and preparing reports to the Treasury Department regarding the employees' accumulated sick and vacation leave. All her duties may be performed remotely. Indeed, from March 16, 2020, until April 2021, she worked remotely using the internet and there was never any issue regarding the quality of her work. On August 5, 2021, Ms. Piñero talked to her supervisor, the Human Resources Director of the Auxiliary Secretary of Management and Administration, who told Ms. Piñero that she was required to submit an affidavit stating her reasons for refusing the vaccine. Ms. Piñero refuses to get vaccinated because, among other things, she understands that the vaccine may complicate her rheumatoid arthritis and her allergic conditions and because all the available vaccines used fetal cell lines in either the development, production, or testing phases.

46. All plaintiffs are career employees in agencies of the central government.

47. None of the plaintiffs work in the health sector, nor are teachers.

48. None of the plaintiffs want to get vaccinated because of their sincere moral or religious beliefs, and/or their underlying medical conditions.

49. All plaintiffs have been required by their respective agencies to work in-person.

50. None of the plaintiffs has been given the option to continue working remotely.

51. All plaintiffs genuinely and strongly believe that vaccination must be voluntary and based on their personal assessment in good conscience of the medical risks/benefits and morality of a particular vaccine.

52. The defendant is Hon. Pedro R. Pierluisi Urrutia, in his official capacity as governor of the Commonwealth of Puerto Rico, who, under color of state law, promulgated the Vaccine Mandate.

**Facts Common to All Claims**

**A.  The Vaccine Mandate and the So-Called Exceptions**

53. On July 28, 2021, the Governor announced to all employees of the central government that there would be a requirement to receive a COVID-19 ("COVID") vaccine.

54. The Vaccinate Mandate goes into effect on August 16, 2021, but it has no specific expiration date.

55. There are serious consequences for those who refuse to vaccinate.

56. Although the Vaccine Mandate is unclear, it seems to constructively discharge those employees who do not want to get vaccinated and lack either a medical or a religious exception.

57. The Vaccine Mandate is unclear because Section 2 states that people who cannot be vaccinated due to religious or medical exceptions must submit an affidavit signed by them and by their spiritual leader or physician certifying that the employee cannot

be vaccinated due to medical or religious reasons, in which case they must submit to

weekly COVID-19 tests to be performed within 72 hours prior to the beginning of the

week, when the appointing authority of the public agencies must ensure compliance.

Section 3 of the Vaccine Mandate, titled "Denial of Vaccination, however, states the

same process for "Any government employee to whom th[e] Executive Order is

applicable and who does not present their immunization certificate." Accordingly, it

is unclear whether an affidavit is actually required to obtain the available exceptions,

or if the government is purposely deceiving the public employees into believing that

only those employees with medical or religious exceptions may refuse the vaccine.

At least one of the plaintiffs, Ms. Piñero, was told by her supervisor that she needed

an affidavit to benefit from the exceptions if she refused to get vaccinated. Otherwise,

she would have to exhaust her available sick and vacation leave and then go into

unpaid leave until she gets vaccinated, or the Vaccine Mandate is no longer in effect.

58. But even employees who submit affidavits to obtain exemptions must nonetheless

submit, every week, a negative COVID test, which they must pay for themselves.

59. The Vaccine Mandate does not contain any provision providing paid leave for

employees to obtain the required medical referral from a physician to get tested, in

which case, each test would cost the employee more than $75.

60. The required medical referral would cost each employee at least $12 per week.

61. For some employees, like plaintiff Leila Ginorio, their insurance plan covers only two tests per month and a medical referral is necessary. Hence, Ms. Ginorio would have to pay at least $174 per month to comply with the testing provisions.

62. Finally, the Mandate requires those employees with an exception to provide the negative tests results at the beginning of each week, and within 72 hours from the time that the test was performed.

63. For employees who must report to work on Mondays, this means that they must take the test on Fridays, as most testing places are closed during the weekend. But the Executive Order does not give employees a paid license to take the test during working hours.

64. And given that most employees would have to get tested on Fridays, the availability of appointments for tests on Fridays will decrease.

65. There is no rational basis to require all public employees who refuse the vaccine to get tested within the same 72 hours' timespan and show the results on Mondays. For most people engage in social activities, increase the probability of infections, over the weekend.

66. But if these employees, like the plaintiffs here, fail to submit their weekly test on Mondays, they will be barred from attending in-person work—and the plaintiffs could, but are not allowed to, work remotely.

67. The plaintiffs, and all similarly situated employees, will be forced to "exhaust the corresponding compensatory time or benefit from any of the applicable regular licenses."

68. "If there is no accumulated balance," the Vaccine Mandate further provides, "the employee must take a leave without pay until the end of the emergency."

69. In other words, the plaintiffs will have to find another job if they want to have gainful employment or otherwise earn a living.

70. As career employees, however, the plaintiffs have a constitutionally protected right in their continued employment. *See, e.g., Torres Solano v. P.R.T.C.*, 127 P.R. Dec. 499 (1990). The plaintiffs' proprietary interest is in relation not only to their continued employment, but also to their salaries. *See, e.g., Diaz Martinez v. Policia de P.R.*, 134.P.R. Dec. 144, PR Offic. Trans. (1993).

**B. The Never-ending "State of Emergency" in Puerto Rico**

71. The government has a responsibility to maintain public health in a way that secures the lives and liberties of all citizens.

72. Pandemics require the state to perform certain interventions to ensure that demands on the healthcare system never exceed its capacity (see below picture regarding "flattening the curve"). CDC, Community Mitigation Guidance, *Interim Pre-pandemic Planning Guidance: Community Strategy for Pandemic Influenza Mitigation in the United States* (Feb. 2007), https://www.cdc.gov/flu/pandemic-resources/pdf/community_mitigation-sm.pdf.

- 20 -

73. The healthcare system capacity to attend to COVID patients includes the availability of medical equipment, hospital beds, hospital ICU beds, and ventilators.

74. At the peak of the pandemic in Puerto Rico, however, fewer than 17% of ICU beds were occupied, and all other healthcare components were burdened at even lower rates (hospital beds at 9.3%, ventilators at 9.2%—both one-day highs).

75. This was, obviously, prior to any vaccine availability. *Data source*, COVID-19 EN CIFRAS EN PUERTO RICO, *Sistema de Salud* (Aug. 15, 2021), https://covid19datos.salud.gov.pr/#sistemas_salud.

76. Puerto Rico's maximum utilization of public health assets ("health care system capacity") due to COVID was 657 hospital beds (9.3%), 111 ICU hospital beds (16.6%) and 118 ventilators (9.2%), while the daily average since August 1, 2020, has been 316 hospital beds (4.6%), 56 ICU hospital beds (8.4%), and 44 ventilators (3.4%). *Data source*, Departamento de Salud de Puerto Rico, COVID-19 EN CIFRAS EN PUERTO RICO, *Sistema de Salud* (Aug. 15, 2021), https://covid19datos.salud.gov.pr/#sistemas_salud.

77. Those facts are so obvious that many of the hospitals, if not most of them, have laid off personnel, since March 2020, due to the low utilization of the healthcare system within Puerto Rico—with many non-COVID treatments and procedures being postponed or canceled in anticipation of a strain that never arrived. Laura M. Quintero, *Hospitales locales aplican cesantías temporeras a más de 400 trabajadores*, El Nuevo                    Dia                    (Apr.                    1,                    2020)

https://www.elnuevodia.com/noticias/locales/notas/hospitales-locales-aplican-cesantias-temporeras-a-mas-de-400-trabajadores/; Noticias, *Denuncian despido alrededor de 250 enfermeros en Puerto Rico,* Radio Isla (Sept. 25, 2020), https://radioisla.tv/denuncian-despido-alrededor-de-250-enfermeros-en-puerto-rico1/

## FLATTENING THE CURVE

*A look at the importance of slowing the spread of a virus, so that the rate of infection doesn't outpace the resources to fight against it.*



Source: CDC

78. The empirical data shows that the "State of Emergency" promulgated 17 months ago is no longer tenable.

79. From the start of the pandemic in January-February 2020, public health experts used both leading (*e.g.,* infection rates) and lagging (*e.g.,* hospitalization rates) factors without a full understanding of the correlation between them. They implemented measures aimed at the leading indicators that did not affect the lagging indicators. Nick Redding, COVID-19 Blog Covid Relevant, *The Importance of Leading and Lagging Indicators for Ongoing Monitoring of COVID-19 in Hawaii,* Hawaii Data Collaborative

(Aug. 4 2020), https://www.hawaiidata.org/ideas/2020/8/4/importance-of-leading-lagging-indicators-monitoring-hawaii-covid19.

80. As scientific studies and empirical data showed, however, COVID-19 much more significantly affected certain groups, namely, the elderly (typically defined as people over 65 years old) and people with predefined autoimmune diseases and other chronic health issues. This led, at the beginning, the correlation between leading factors within a community (total cases) and lagging factors (hospitalizations and deaths) to show a misleading presentation of the pandemic's development. CDC, Morbidity and Mortality Weekly Report *(MMWR)*, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020* (Weekly / April 17, 2020 / 69(15);458–464), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

81. Over time, a correlation was established between $R_0$ (how infectious each person with the disease is), "positivity" rate (the rate of infection in society), and the number of positive cases and hospitalizations. Livio Fenga and Mauro Gaspari, National Center for Biotechnology Information, *Predictive Capacity of COVID-19 Test Positivity Rate*, Pubmed.gov, National Library of Medicine (Apr. 1, 2021), https://pubmed.ncbi.nlm.nih.gov/33916239/.

82. Eventually, and sooner than expected, however, the most important exogenous shock possible, a vaccine, was introduced in that correlation function.

83. In early 2021, the Food and Drug Administration authorized three vaccines (Pfizer-
    BioNtech, Moderna, J&J/Janssen) for use in the United States (including Puerto Rico).
    The introduction of these vaccines changed the previous relationship between
    leading and lagging factors. In short, vaccination significantly reduced the spread of
    COVID-19. WHO, Interim Guidance, *Evaluation of COVID-19 vaccine effectiveness*
    (Mar. 17, 2021), https://www.who.int/publications/i/item/WHO-2019-nCoV-
    vaccine_effectiveness-measurement-2021.1.

84. Once vaccines with such effective results were introduced, concerns that our
    hospitals could be overwhelmed by an excess of COVID cases were obviated. CDC,
    Morbidity and Mortality Weekly Report (*MMWR*), *Effectiveness of COVID-19 Vaccines
    in Preventing Hospitalization Among Adults Aged ≥65 Years — COVID-NET, 13 States,
    February–April 2021* (Aug. 13, 2021 / 70(32);1088-1093),
    https://www.cdc.gov/mmwr/volumes/70/wr/mm7032e3.htm.

85. Although, as reflected below, Puerto Rico's health system was never strained by
    COVID, now, with the introduction of the vaccine there is no chance that it could be
    in jeopardy, even with the full removal of any kind of pandemic-related restrictions.

86. Since January 21, 2020, Puerto Rico has had 4,723 cases of COVID-19 per 100,000
    people, which rate is 52nd of 59 U.S. states and territories (including New York City
    and the District of Columbia). Only Hawaii, Vermont, the Virgin Islands, Northern
    Mariana Islands, Palau, and Marshall Islands have had fewer cases per 100,000
    people than Puerto Rico. CDC, COVID Data Tracker, United States COVID-19 Cases,

Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction, *Data Table for Case Rate by State/Territory* (Aug. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#cases_all-rate.

87. Even though Puerto Rico has the highest elderly population of any state or territory (20.8%), since January 21, 2020, Puerto Rico is 47th of 58 in death rate (83 deaths per 100,000 people) among states and territories (plus NYC and D.C.). Only Washington, Utah, Oregon, Maine, Alaska, Vermont, Hawaii, Virgin Islands, Northern Mariana Islands, Palau, and Republic of Marshall Islands have a lower death rate "related to" COVID than Puerto Rico. Christine L. Himes and Lillian Kilduff, *Resource Library, Which U.S. States Have the Older Populations?*, PRB (Mar. 19, 2019), https://www.prb.org/resources/which-us-states-are-the-oldest/; United States Census Bureu, *Quick Facts Puerto Rico* (July 1, 2019 (v2019), https://www.census.gov/quickfacts/PR; CDC, COVID Data Tracker, United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction, *Data Table for Death Rate by State/Territory* (Aug. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#cases_deathsper100k.

88. Puerto Rico's death rate "related to" COVID per 100,000 (83) happens to be 50% lower than the average within the States (186). Being an island (really an archipelago) helps. CDC, COVID Data Tracker, *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction* (Aug. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#cases_deathsper100k.

89. Puerto Rico has 68.1% of the eligible population fully vaccinated and over 78.4% of the eligible population with at least one dose. Of those 60 and older, 80% have received at least one dose, and 73% are fully vaccinated. Departamento de Salud de Puerto Rico, COVID-19 EN CIFRAS EN PUERTO RICO, *Vacunación* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#vacunacion.

90. Puerto Rico has second to last (ahead only of the U.S. Virgin Islands), in total tests performed per 100,000 people among U.S. jurisdictions. The U.S. test rate is an amazing 158,684 per 100,000 people, while Puerto Rico's is 39,677. Puerto Rico performs 75% less COVID testing per 100,000 people than the average total of tests in the mainland. See below chart. CDC, COVID Data Tracker, United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction, *Data Table for Cumulative COVID-19 Nucleic Acid Amplification Tests (NAATs) Performed per 100k by State/Territory* (Aug. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#cases_testsper100k.

91. Puerto Rico is currently performing approximately half the tests than the States. Puerto Rico averages, in the last 30 days, 4,155 new tests per 100,000, while the average among the states is 6,943. CDC, COVID Data Tracker, United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction, *Data Table for COVID-19 Nucleic Acid Amplification Tests (NAATs) Performed in Last 30 Days per 100k by State/Territory* (Aug. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#cases_testsper100k30day.

92. For the percentage of positivity to properly represent the population, it is imperative that the total number of tests carried out (denominator) be the most representative and constant sample of the population. If not, the testing data can skew towards one side or the other, providing erroneous and misleading conclusions. This is the case in Puerto Rico. The main reason for this statistical slant lies in the following: Public Health Madison & Dane County, Blog, *Understanding Percent Positivity* (Oct. 1, 2020), https://www.publichealthmdc.com/blog/understanding-percent-positivity.

   a. On the mainland, the Department of Health and Human Services (HHS) created the system of "Community-Based Testing Sites." So COVID-19 tests are available, free of charge, throughout the country in select health centers and pharmacies.

   b. Indeed, the Family First Coronavirus Response Act ensures that COVID-19 testing is free to anyone in the US, including those without health insurance.

   c. On the mainland, one can take the test, free of charge and without any pre-requisite, at CVS, Rite Aid, Walgreens, Wal-Mart, and independent in-network pharmacies. Moreover, tests are offered daily, at fixed public locations set up by state governments, at no cost and without any prerequisite. U.S. Department of Health and Human Services, Coronavirus, *Community-Based Testing Sites for COVID-19* (as seen on Aug 15, 2021), https://www.hhs.gov/coronavirus/community-based-testing-sites/index.html.

d.  In Puerto Rico, however, the offering of free PCR testing through these stores is extremely limited (less than 5% of the total tests performed).  Such free testing is the exception, not the rule.

e.  Test offerings by local or municipal government are even lower, less than 2%. And they are also random, offered only at a particular day, usually a Saturday or Sunday every few months with significant lines and cumbersome processes.

f.  In Puerto Rico, the main source of PCR tests is through private laboratories, which require a medical referral and an insurance plan. Otherwise, test-seekers need to pay over $75. GISCorps COVID-19 Testing Sites Locator, *Locate COVID-19 Testing Sites (00936)* (as seen on Aug. 15, 2021), https://www.arcgis.com/apps/webappviewer/index.html?id=2ec47819f57c40598a4eaf45bf9e0d16. Indeed, earlier in the pandemic medical doctors complained that the requirement for medical referrals was becoming a logistic problema. *See Abogan para que se elimine requisito de referido en servicio de telemedicina y la prueba de COVID-19* (Nov. 12, 2020), https://medicinaysaludpublica.com/noticias/administracion-y-gerencia-medicina/abogan-para-que-se-elimine-requisito-de-referido-en-servicio-de-telemedicina-y-la-prueba-de-covid-19/7244.

93. The disincentive created by the current health care system for residents of Puerto Rico causes only people that have an underlying need to get tested go through the strenuous process to do so. The people in this category are the people who believe

that they have been exposed, people who have symptoms, people who have traveled, or people whose employers require them to do so, among others.

94. The cost and hassle of getting tested creates a natural deterrent for the general population to get tested, which skews Puerto Rico's positivity rate.

95. The "positivity rate" thus does not reflect a proper sample representing the population, so it has always been much higher in Puerto Rico than on the mainland— and is completely unreliable and misleading.

96. Indeed, in April 2021, the John Hopkins University Coronavirus Resource Center stopped using Puerto Rico's positivity rate statistics. *See* https://coronavirus.jhu.edu/region/us/puerto-rico.

97. The highest seven-day moving average of confirmed cases was on November 23, 2020, with 848. Our daily average 7-day moving average confirmed cases through June 1, 2021, when the vaccine had over a 60% implementation, to August 12, 2021, was 135 cases. Prior to the 60% vaccine implementation, through July 1, 2020, to May 31, 2021, the daily average of the 7-day moving average for confirmed cases was 340. *Data source*, COVID-19 EN CIFRAS EN PUERTO RICO, *Casos* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#casos.

98.  The above represents almost a three-time reduction in the 7-day moving average of daily confirmed cases after a 60% vaccine introduction. *See* graph below.



99. When one compares Puerto Rico 's cumulative confirmed cases with the confirmed cases within the five states with the closest population (Arkansas, Connecticut, Iowa, Nevada, and Utah), some of them with considerably lower population density, the Commonwealth is approximately 75% lower. *See* graph below. CDC, COVID Data Tracker, Compare Trends in COVID-19 Cases and Deaths in the US, *Cumulative cases of Covid-19, reported to CDC, in AR, CT, IA, NV, UT, and PR* (Aug. 14, 2021) https://covid.cdc.gov/covid-data-tracker/#compare-trends_cases-cum-rate-lin.

100.    The highest usage of hospital beds for COVID in Puerto Rico was 657 (for ICU beds, 110), which represents a 9.3% hospital utilization (December 10, 2020) (for ICU beds 16.5%, on November 24, 2020). At that time, of course, there was no vaccine and significant restrictions had been put in by executive order. COVID-19 EN CIFRAS EN PUERTO RICO, *Sistema de Salud* (Aug. 15, 2021), https://covid19datos.salud.gov.pr/#sistemas_salud.



101.    Currently, Puerto Rico has 398 hospital beds occupied (94 in the ICU), which

represents a hospital utilization of 5.6% (for ICU, 14.1%). Our hospital utilization for

COVID from August 1, 2020, until May 31, 2021, averaged 366 beds (64 in the ICU),

for a utilization of 5.3% (for ICU beds 9.6%). Since the 60% vaccine implementation

rate was achieved on June 1, 2021, and up to August 16, 2021, our hospitalizations for

COVID have averaged 102 (24 for ICU beds) which means a utilization of 1.4% (for

ICU beds 3.6%). *See* graph below. *Data source*, COVID-19 EN CIFRAS EN PUERTO

RICO, *Sistema       de       Salud* (Aug.        16,        2021),

https://covid19datos.salud.gov.pr/#sistemas_salud.



### Puerto Rico Hospitalizations COVID
### Aug 1, 2020 to Aug 16, 2021

Avg. 366 (5.3%)

Avg. 102 (1.4%)

**657 (9.3%)**

60% fully vaccinated

**398 (5.6%)**

— Util. Beds COVID

Source: Puerto Rico Health Department, https://covid19datos.salud.gov.pr/#sistemas_salud

### Puerto Rico Hospitalizations ICU COVID
### Aug 1, 2020 to Aug 16, 2021

Avg. 64 (9.6%)

Avg. 24 (3.6%)

**110 (16.5%)**

60% fully vaccinated

**94 (14.1%)**

— Util. ICU COVID

102.     The above is almost four times (4x) fewer hospital beds (three times (3x) fewer for ICU beds) used due to COVID after 60% vaccine implementation, as compared to the entire previous pandemic period.

103.     Moreover, Puerto Rico hospitals have always had significant number of extra beds throughout the pandemic.

104.     The average of empty beds within Puerto Rico hospitals from August 1, 2020, to August 15, 2021, was 2,892 empty beds (41%) and for ICU beds it was 205 (31%). *See* graphs below. *Data source*, COVID-19 EN CIFRAS EN PUERTO RICO, *Sistema de Salud* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#sistemas_salud.





105.    Puerto Rico has had a total of 2,662 deaths related to COVID since March 17, 2020. COVID-19 EN CIFRAS EN PUERTO RICO, *Defunciones* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#defunciones (last seen, Aug. 16, 2021). With 83 deaths per 100,000 people, the Commonwealth ranks 47th out of 58 states and territories (and New York City and District of Columbia). *Data Table for Death Rate by State/Territory* (Aug. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#cases_deathsper100k. Puerto Rico's death rate is less than 50% lower than the average on the mainland, where it is 186 per 100,000. *Data source*, *id.*

106.    It bears noting that these numbers represent deaths "related to" COVID, so it includes (a) confirmed COVID-19 deaths, which are deaths of people with one or more positive molecular tests, (b) likely COVID-19 deaths, which include deaths of: (1) people who meet clinical criteria and evidence epidemiological as defined by the

CSTE, without confirmatory tests for COVID-19; (2) people who test positive for antigens and meet the clinical criteria or epidemiological evidence as defined by the CSTE; (3) deaths that meet the criteria for vital statistics in which no evidence of confirmation for COVID-19; and (4) suspicious deaths from COVID-19, which include deaths of people in whom a specific antibody in serum, plasma, or blood, or a specific antigen is detected by immunocytochemistry in an autopsy specimen, which were not reported as confirmed or probable COVID-19 cases.

107. Over 78% (78.1%) of the COVID-related deaths in Puerto Rico are from the population of those 60 years and older. *See* graph and table below, COVID-19 EN CIFRAS EN PUERTO RICO, *Defunciones* (Aug. 14, 2021) https://covid19datos.salud.gov.pr/#defunciones.



Pirámide de defunciones por COVID-19 por grupos de edad y sexo

Tabla de defunciones por COVID-19 por grupos de edad y sexo

| Edades | Masculino | Femenino | Total |
|---|---|---|---|
| 80 + | 415 (15.9%) | 431 (18.5%) | **846** (32.4%) |
| 70 - 79 | 428 (16.4%) | 279 (10.7%) | **707** (27.1%) |
| 60 - 69 | 281 (10.8%) | 218 (8.3%) | **499** (19.1%) |
| 50 - 59 | 208 (8%) | 137 (5.2%) | **345** (13.2%) |
| 40 - 49 | 90 (3.4%) | 49 (1.9%) | **139** (5.3%) |
| 30 - 39 | 45 (1.7%) | 5 (0.2%) | **50** (1.9%) |
| 20 - 29 | 12 (0.5%) | 9 (0.3%) | **21** (0.8%) |
| 10 - 19 | 1 (0%) | 3 (0.1%) | **4** (0.2%) |
| 0 - 9 | 0 (0%) | 0 (0%) | **0** (0%) |
| **Total** | **1,480** (57%) | **1,131** (43%) | **2,611** (100%) |

Fuente: Dpto. De Salud de PR

108. As of August 15, 2021, 81% of the age group 60 years and older has received at least one dose and 73% are fully vaccinated. *See* table below. COVID-19 EN CIFRAS EN PUERTO RICO, *Vacunación* (Aug. 14, 2021), https://covid19datos.salud.gov.pr/#vacunacion.



| Grupo de edad | Personas aptas (12 años o más) con al menos una dosis de vacunas |
|---|---|
| 12 - 15 | 103,331 |
| 16 - 19 | 115,918 |
| 20 - 29 | 288,876 |
| 30 - 39 | 278,362 |
| 40 - 49 | 326,474 |
| 50 - 59 | 352,527 |
| 60 - 69 | 330,642 |
| 70 - 79 | 252,702 |
| 80 + | 129,921 |
| No Definido | 925 |
| Total | 2,179,678 |

Datos obtenidos del Puerto Rico Electronic Immunization System (PREIS)          Fuente: Dpto. De Salud de PR

109.  Since June 1, 2021, when Puerto Rico reached 60% implementation of the vaccine

within its population, our COVID-related death rate has been at its lowest, with a

daily average of 1.3.  Our average daily death rate from August 1, 2020, through May

31, 2021 was 3.4.  Since June 15, 2021, when the Delta variant was confirmed, up to

August 14, 2021, the average daily deaths is 2.0. That is forty percent (40%) less the

average daily deaths now, with Delta variant, that prior to the 60% vaccination. *See*

graph below. *Data source*, Departamento de Salud de Puerto Rico, COVID-19 EN

CIFRAS     EN     PUERTO     RICO,     *Defunciones*     (Aug.     16,     2021)

https://covid19datos.salud.gov.pr/#defunciones; *see also* graph below.



110.   When one compares Puerto Rico's cumulative deaths related to COVID with the

five states with the closest population (AR, CT, IA, NV, UT), some of them with

considerably lower population density, we are more than 100% lower, except Utah,

which is similar with a population density of 14.12 people/km², *see*

https://worldpopulationreview.com/states/utah-population, when Puerto Rico's

population density is 319 people/km², *see*

https://worldpopulationreview.com/countries/puerto-rico-population, 22 times

higher population density. *See* graph below. Compare Trends in COVID-19 Cases

and Deaths in the US, *Cumulative deaths attributed to Covid-19, reported to CDC, in AR,*

*CT, IA, NV, UT, and PR* (Aug. 14, 2021) https://covid.cdc.gov/covid-data-

tracker/#compare-trends_cases-cum-rate-lin.



Source: CDC

111.   To showcase how miniscule is the COVID situation in Puerto Rico in comparison

to its handling and the balance of other societal needs and liberties, here are the actual

numbers as of August 1, 2021:

a.   As of August 15, 2021 (after 17 months), only 133,621 people (4.3%) have tested

positive (confirmed) for COVID-19. Of those, 127,659 have recuperated (95.5%),

with the smallest amount of these requiring attention by our public health system.

Currently, we have approximately 3,300 (2.5%) active cases of COVID and a

cumulative total of 2,662 COVID related deaths (2%). *Data source*, COVID-19 EN

CIFRAS EN PUERTO RICO, https://covid19datos.salud.gov.pr/.

b.  In other words, more than 2,966,379 people (95.7% of the population) have not

gotten the virus, or at least never tested positive for it. Currently, there is 0.10%

active cases and we have had 0.085% deaths related to COVID in 17 months. *Data*

*source*, COVID-19 EN CIFRAS EN PUERTO RICO, *Casos* y *Defunciones* (Aug. 14,

2021),https://covid19datos.salud.gov.pr/#casos,https://covid19datos.salud.gov.p

r/#defunciones

c.  Moreover, Puerto Rico has at least 2,230,431 people (78.4%) with at least one

vaccine dose. COVID-19 EN CIFRAS EN PUERTO RICO, *Vacunación,* (Aug. 16,

2021), https://covid19datos.salud.gov.pr/#vacunacion.

112.     To put everything into perspective, refer to the "dot map" below to represent

the above data. As of August 15, 2021: Active Cases (red): 0.12%; Recovered (green):

4.48%; Deaths (yellow): 0.086%; Vaccinated (never infected) (light blue): 78.31%; Not

Vaccinated, never infected (black and light blue): 95.69%. Each dot is 3,106 people, all

12 or older. *See* charts below, *data sources* in ¶ 111 (a), (b) and (c).



## Statement of Claims

*Count No. I: (Fourteenth Amendment Substantive and Procedural Due Process)*

113.  The plaintiffs incorporate by reference all the foregoing paragraphs.

114.  Puerto Rico is the functional equivalent of a State for § 1983 purposes, *Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 145 (1st Cir. 2002).

115.  In issuing and implementing the Vaccine Mandate, the Governor is acting under color of state law.

116.   The Vaccine Mandate violates the liberty protected by the Fourteenth Amendment to the Constitution, which includes rights of personal autonomy and bodily integrity, and the right to reject medical treatment.

117.   "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992).

118.   The ability to decide whether to accept or refuse medical treatment is a fundamental right.

119.   The Commonwealth's Vaccine Mandate violates the plaintiffs' constitutional right to decisional privacy.

120.   As mandated vaccinations are a substantial burden, the defendant must prove narrow tailoring to a compelling interest that justifies mandatory vaccinations, not any more general interest.

121.   But even if there were a compelling interest in mandating vaccinations, the Vaccine Mandate is not narrowly tailored to such an interest.

122.   For example, a blanket mandate ignores individual factors increasing (older age, co-morbidities) or decreasing (having had COVID) the risks that the plaintiffs— indeed, all Commonwealth employees—pose to themselves or to others.

123.   There is less justification for government coercion now than before vaccines were developed, with the pandemic having subsided and Commonwealth's hospitals facing no threat of being overwhelmed by COVID-19 cases.

124.    Meanwhile, according to the CDC, evidence shows the Delta variant might be spread as easily by vaccinated people who become infected as by the unvaccinated—*and that it is less deadly than the previous virus.*

125.    The CDC pointed to Provincetown, Massachusetts, where it said large gatherings in July at bars, nightclubs, and house parties led to hundreds of COVID infections (but only four people were hospitalized).

126.    According to the CDC, the Provincetown data contained two eyebrow-raising findings: nearly three-quarters of infected people were fully vaccinated, and samples showed that the amount of viral load was similar between the vaccinated and unvaccinated.

127.    And the statistics and recent studies show that, given the effectiveness of the EUA vaccines, the vaccinated are rarely affected by the unvaccinated, even with the advent of the Delta variant.

128.    In the United States, the data from the 25 states that report breakthrough cases, hospitalizations, and deaths indicate that these occurrences are extremely rare among those who are fully vaccinated. *See* Chart below.



*See* COVID-19 Vaccine Breakthrough Cases: Data from the States | KFF (https://www.kff.org/policy-watch/covid-19-vaccine-breakthrough-cases-data-from-the-states/) (last seen on August 15, 2021).

129.    And as more people get vaccinated, the share of cases, hospitalizations, and deaths represented by unvaccinated people will tend to fall, because there will be fewer unvaccinated people in the population. That will be true even if infection, hospitalization, and death from COVID-19 is still very rare among vaccinated people.

130.    The logical conclusion is that the Vaccine Mandate is the government's attempt to protect the unvaccinated population, who choose to assume the risk of not getting vaccinated, from themselves.

131.    Given the foregoing, requiring a negligible number of people to become vaccinated goes "beyond what [i]s reasonably required for the safety of the public," *Jacobson*, 197 U.S. at 28.

132.   The same evidence that shows there is no compelling interest or narrow tailoring with Vaccine Mandate shows that it fails even under *Jacobson*.

133.   Even if the government could show a compelling interest for the Vaccine Mandate, there are less onerous means to obtain the desired result which would lessen the burden of the plaintiffs' individual liberties and property interest, for example:

    i.   Allowing the employees to work remotely.

    ii.   Alternatively, the Government's providing and administering the COVID-19 tests at the workplace.

    iii.   Alternatively, the Government's providing paid leave for employees to obtain the medical referrals necessary to have the COVID-19 tests covered by the employees' insurance plans and the Government paying for any required tests that the employees' insurance plans do not cover.

134.   The Vaccine Mandate is thus unconstitutional under both current strict-scrutiny jurisprudence and *Jacobson's* older special rule.

135.   What is more, the Vaccine Mandate also violates the employees' procedural due process rights under the Fourteenth Amendment, which bars the Commonwealth from discharging, without due process of law, a government employee who has a property interest in continued public employment.

136.   "To state a procedural due process claim under § 1983, the plaintiffs must allege facts which, if true, establish that they (1) had a property interest of constitutional

magnitude and (2) was deprived of that property interest without due process of law." *Clukey v. Town of Camden*, 717 F.3d 52, 64–55 (1st Cir. 2013).

137. "[P]roperty interests are creatures of state law, and under the laws of Puerto Rico, public employees who lawfully hold career positions have a protected property interest in continued employment in those positions." *Casiano–Montañez v. State Ins. Fund Corp.*, 707 F.3d 124, 129 (1st Cir. 2013).

138. Because all the plaintiffs are career public-sector employees, they have a property interest of constitutional magnitude, as interpreted by Puerto Rico law.

139. But because the Vaccine Mandate effectively removes their property interest—by relegating them to an indefinite "unpaid leave"—it deprives the plaintiffs of their continued employment.

140. The plaintiffs, however, were offered no hearing or due process of law.

141. Accordingly, the Vaccine Mandate also violates the Due Process Clause of the Fourteenth Amendment.

*Count No. II:   RFRA*

142. The plaintiffs incorporate by reference all the foregoing paragraphs.

143. "RFRA applies to actions by the Commonwealth of Puerto Rico as a covered entity of the United States . . . ." *Comité Fiestas De La Calle San Sebastián, Inc. v. Cruz*, 207 F. Supp. 3d 129, 144 (D.P.R. 2016).

144. RFRA describes the "free exercise of religion as an unalienable right." 42 U.S.C. §§ 2000bb(a)(1).

145. To protect this right, Congress provided that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." §§ 2000bb–1(a)–(b).

146. A person whose religious practices are burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief." § 2000bb–1(c).

147. Here, for instance, the plaintiffs' sincere religious beliefs compel them not to take the COVID vaccine.

148. Indeed, plaintiffs Ginorio and González object to the COVID vaccine based on their interpretation of the Bible.

149. The Vaccinate Mandate substantially burdens the plaintiffs' exercise of religion, because it obligates them to furnish an affidavit in which both she and her "ecclesiastical leader of their religion or sect, swear under penalty of perjury that, because of their religious beliefs, she cannot be inoculated against COVID-19."

150. But the plaintiffs' sincere religious beliefs cannot be conditioned on a third-party's imprimatur.

151. The Supreme Court has "reject[ed] the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." *Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989).

152. By forcing the plaintiffs to submit an affidavit by a spiritual leader, they force the plaintiffs to "respond[] to the commands of a particular religious organization." *Id*.

153. And Ms. Ginorio's spiritual leader refuses to sign an affidavit for her to obtain the religious exception.

154. Yet the affidavits are not even enough, and the Vaccine Mandate further burdens the plaintiffs' religious beliefs by coercing them into succumbing to vaccination.

155. Indeed, the religious objectors would need to obtain negative COVID-19 results on a weekly basis by having objects inserted up their noses weekly at their own cost, on pain of losing all their accrued vacation and sick days, and eventually their salaries.

156. And some may consider that forcing citizens to have objects inserted up their noses weekly against their will is itself a personal-integrity violation. *Cf. Maryland v. King*, 569 U.S. 435, 482 (2013) ("But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.") (Scalia, J., dissenting).

157. Moreover, the plaintiffs would have to obtain medical referrals, also at their own cost, for each weekly COVID-19 test.

158. The plaintiffs, who work Mondays, would have to take a test each Friday or Saturday, because the Vaccine Mandate dictates that tests must be performed "within

a maximum period of seventy-two (72) hours prior" to submission, and "[t]he appointing authorities of the public agencies, or the person to whom they delegate, should ensure the compliance with the above at the beginning of each week."

159. The Vaccine Mandate does not provide public employees with paid leave to obtain the required medical referrals or to take the test.

160. For instance, the Vaccine Mandate does not provide the option of any criteria to determine which type of employee may work remotely.

161. The Vaccine Mandate could also provide the Government employees with the required tests on site, at the Government's cost, at the beginning of each week.

162. The Vaccine Mandate could provide Government employees with paid leave to obtain the required medical referrals and take the tests each week.

163. Because the Vaccine Mandate is not the least restrictive way in which to further the Commonwealth's interest, it violates RFRA.

164. Moreover, to the extent that the Vaccine Mandate requires affidavits from employees who refuse to get vaccinated due to their religious beliefs but does *not* require the affidavit of other employees who choose not to get vaccinated for any other reason, the Vaccine Mandate imposes an additional burden only to those employees with certain religious faiths and beliefs, which also violates RFRA.

### Count No. III: Violation of the Supremacy Clause

165. The plaintiffs incorporate by reference all the foregoing paragraphs as though set forth fully herein.

166. The U.S. Constitution and federal laws are the "Supreme Law of the Land" and supersede the constitutions and laws of any state. U.S. Const. art. VI, cl. 2.

167. State law is preempted to the extent that it conflicts with federal law.

168. Federal law need not contain an express statement of intent to preempt state law for a court to find any conflicting state action invalid under the Supremacy Clause.

169. Section 564 of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3, authorizes the FDA to issue an EUA for a medical product, such as a vaccine, under certain emergency circumstances.

170. None of the three available vaccines have been fully approved by the FDA; they are available to the public pursuant to the EUA statute.

171. The EUA statute mandates informed and voluntary consent. *See John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to EUA "on a voluntary basis"). *See also* 21 U.S.C. § 360bbb-3(e)(1)(A)(ii).

172. It expressly states that recipients of products approved for use under it be informed of the "option to accept or refuse administration," and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id*.

173. Because the Vaccine Mandated implemented through Executive Order by the Government of Puerto Rico coerces the plaintiffs by making enjoyment of his constitutionally and statutorily protected consent rights contingent upon receiving

an experimental vaccine, it cannot be reconciled with the letter or spirit of the EUA statute. *See* 21 U.S.C. § 360bbb-3.

174. In short, the Vaccine Mandate frustrates the objectives of the EUA process.

175. In an opinion recently made public, the U.S. Department of Justice's Office of Legal Counsel ("OLC") argues that the EUA does not bar public and private entities from mandating that their employees receive one of the vaccines. *See* "Memorandum Opinion for the Deputy Counsel to the President," *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* (July 6, 2021) (OLC Op.) at 7-13, available at https://www.justice.gov/olc/file/1415446.

176. The opinion is silent on preemption, however, and thus cannot be read to prevent the EUA statute from having its ordinary preemptive effect, not least because OLC was not assigned a role by Congress to administer the EUA statute.

177. Moreover, the separation of powers dictates that this Court is not bound by the OLC Opinion.

178. The OLC Opinion is premised on unsound reasoning. While it acknowledges that EUA products have "not yet been generally approved as safe and effective," and that recipients must be given "the option to accept or refuse administration of the product," it nevertheless maintains that the EUA vaccines can be mandated. OLC Op. at 3-4, 7.

179. According to OLC, the requirement that recipients be "informed" of their right to refuse the product does not mean that an administrator is precluded from mandating the vaccine. All that an administrator must do, in OLC's view, is tell the recipient they have the option to refuse the vaccine. *Id.* at 7-13.7. But that interpretation ignores that refusing vaccination entails consequences that effectively coerce or at least unconstitutionally leverage the public employees into taking the vaccine, infringing the plaintiffs' constitutional and statutory rights to informed consent.

180. The sensible way of reading the statute is that Congress called for potential users to be informed precisely so that they could refuse to receive an EUA product.

181. If the OLC Opinion were taken as a blanket authorization for state and local governments to impose vaccine mandates, a critical portion of the EUA statute would be rendered superfluous.

182. The plain language states that the recipient of an EUA vaccine must be informed "of the option to accept or refuse the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). Congress's intent to protect informed consent is pellucid from the statute, more so when read against the framework of what the Constitution requires and against the common law rules from which the constitutional protections for informed consent arose.

183. The statutory prohibition on mandating EUA products is buttressed by a corresponding provision that allows the president to waive the option to accept or refuse an EUA product to members of the U.S. military when national security so

requires. 10 U.S.C. § 1107a(a)(1). That provision would be redundant if consent could be circumvented merely by telling a vaccine recipient that he or she is free to refuse the vaccine but would nonetheless encounter adverse consequences that violated the doctrine of unconstitutional conditions.

184. Sidestepping the text about the military waiver, OLC spins out a tortured argument under which the president's waiver would merely deprive military members of their rights to *know* that they can refuse the EUA product—rather than waiving their rights to actually refuse the product. OLC Op. at 14-15.

185. But OLC's obtuse reading runs head on against the Department of Defense's understanding of this statutory provision.

186. Just as Congress prohibited the federal government from mandating EUA products, the state governments cannot do so, for the Supremacy Clause dictates that the EUA statute must prevail over conflicting state law or Executive Orders.

187. The Vaccine Mandate is thus preempted by federal law.

188. The Vaccine Mandate is invalid pursuant to Article VI, Cl. 2 of the United States Constitution, and must be enjoined and set aside.

### *Count No. IV:* **Pendent Claims Under the *Puerto Rico Constitution***

189. The plaintiffs incorporate by reference all the foregoing paragraphs.

190. The Puerto Rico Constitution makes it clear that "[t]he dignity of the human being is inviolable." Puerto Rico Const. Art. II, § 1.

191. And Article 2, Section 8 guarantees every person "the right to the protection of law against abusive attacks on his honor, reputation and private or family life." *Id*. § 8.

192. The Puerto Rico Supreme Court has held that the "scope for a just interpretation [of invasion of privacy] is very wide." *Cortes Portalatin v. Hau Colon*, 3 P.R. Offic. Trans. 1019, 103 D.P.R. 734 (1975).

193. For the same reasons that the Vaccinate Mandate violates the Due Process Clause of the Fourteenth Amendment, it also runs head-on into the plaintiffs' constitutional right to decisional privacy under the Puerto Rico Constitution.

194. The Puerto Rico Supreme Court has made it clear that "it is impossible to obtain a really voluntary waiver of the right of privacy, particularly if such waiver becomes a requirement for obtaining a job or for staying in it. The risk of losing a job or not getting one, and the worker's position of disadvantage vis-à-vis his employer's, impair the possibility of a really free and voluntary waiver." *Arroyo v. Rattan Specialties, Inc.*, 117 P.R. Dec. 35 (1986).

195. And the exceptions provided for by the Vaccine Mandate—mandatory proof of negative COVID tests, financed by the plaintiffs—violate their constitutional rights to privacy and harm to their personal integrity.

**Prayer for Relief**

**WHEREFORE**, the plaintiffs request a judgment where this Court:

a. Declares the Vaccine Mandate partially unconstitutional on its face, or, alternatively, declares the Vaccine Mandate unconstitutional—and in violation of RFRA—as applied to each plaintiff;

b. Declares that the Vaccine Mandate is preempted by the EUA statute and the Supremacy Clause, until full approval is provided by the FDA;

c. Enjoins the defendant from enforcing the Vaccine Mandate;

d. Alternatively, declares that

  i. an affidavit or medical certificate is unnecessary to refuse vaccination

  ii. that each public agency must allow each of the plaintiffs to work remotely;

  iii. that the Government must provide each of the plaintiffs the right to a hearing, with minimum due process guarantees, to determine whether they are able to work remotely;

e. Alternatively, compels the government to provide the required COVID tests at each of the employees' workplaces;

f. Alternatively, compels the government to grant paid leave to each of the plaintiffs so that they may obtain the required medical referrals and take the mandated COVID tests, and reimburse the plaintiffs for any expenses associated with taking the required COVID tests each week, including all

applicable insurance plan deductibles and the cost of tests that are not covered

by the employees' health insurance plans;

g.   Grants the plaintiffs their costs and attorney's fees under 42 U.S.C. § 1988, and

any other applicable authority; and

h.   Grants any and all other such relief as this Court deems just and equitable.

## Jury Demand

The plaintiffs demand a trial by jury of any triable issues in this case.

Dated: August 16, 2021                    Respectfully submitted,

| | |
|---|---|
| **B&D LLC**<br>José R. Dávila-Acevedo<br>jose@bdlawpr.com<br>USDCPR No. 231511<br>1519 Ponce de Leon Ave. Ste. 501<br>San Juan, PR 00909<br>787-931-0941 | **Puerto Rico Institute for<br>Economic Liberty**<br>/s/ *Arturo V. Bauermeister*<br>Arturo V. Bauermeister<br>bauermeistera@ilepr.org<br>USDCPR No. 302604<br>P.O. Box 363232<br>San Juan, PR 00936-3232<br>Tel: 787.721.5290<br>Fax:  787.721.5938 |
| | Ilya Shapiro<br>D.C. Bar. No. 489100<br>(admitted *pro hac vice*)<br>1000 Mass. Ave. NW<br>Washington, DC 20001<br>202-577-1134 |

*Counsel for Plaintiffs*