## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ZULAY RODRIGUEZ-VÉLEZ, <u>et al.</u>,

     Plaintiffs,

     v.

PEDRO R. PIERLUISI-URRUTIA,

     Defendant.

CIVIL NO.  21-1366 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Plaintiffs are career employees of the Executive Branch of the Government of Puerto Rico ("Government").  They sued the Governor, Hon. Pedro R. Pierluisi-Urrutia, in his official capacity pursuant to 42 U.S.C. § 1983, challenging on its face and as applied Executive Order ("EO") 21-058, which requires, subject to exceptions, that all Government employees be vaccinated against COVID-19.  In their view, the vaccination mandate violates the Due Process Clause of the Fourteenth Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-2000bb940.[1]  Further, invoking the court's supplementary jurisdiction, they contend that the mandate runs contrary to the dignity and privacy provisions of the Constitution of the Commonwealth of Puerto Rico.  They amended the complaint and moved for a preliminary injunction to block implementation of EO 21-058.  The Governor opposed the request for preliminary injunction and asked that the action be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[1] Plaintiffs also alleged that the Food and Drug Administration's Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3, preempts the vaccination mandate which, for that reason, is invalid under the Supremacy Clause, Art. VI, Cl. 2 of the U.S. Constitution (Docket No. 1, ¶¶ 168-194; Docket No. 11, ¶¶ 165-188).  Later, they withdrew the claim without prejudice (Docket No. 85).

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 2

With the filings in place, the court held a 6-day preliminary injunction hearing.  Having carefully studied all of the filings, relevant sources of authority, documentary evidence, and the testimony of the witnesses that testified during the hearing, the request for preliminary injunction is DENIED.  Over and above, plaintiffs did not present a cognizable claim for which relief may be granted.  In consequence, the case must be, and is HEREBY DISMISSED.  As explained in detail below, EO 21-058 serves a compelling state interest; is directly linked to a public-health crisis; contains reasonable opt-outs for those who do not wish to vaccinate; and does not violate the Due Process Clause of the Fourteenth Amendment, the RFRA or the dignity-privacy provisions of the Constitution of Puerto Rico.

## I.    **INTRODUCTION**

### A.  **Context**

The case comes at a critical moment in humankind's history, in the context of an ongoing global COVID-19 pandemic, with new infections and deaths being reported every day.  A COVID-19 outbreak was first identified in January 2020 in Wuhan, China, and it has since swept the globe.  See,  https://www.who.int/news/item/27-04-2020-who-timeline---covid-19 (last visited October 13, 2021).  The seriousness of the outbreak came to the attention of many on January 30, 2020, when the United Nations World Health Organization ("WHO") declared the effects of the outbreak a public health emergency.  Id.  The next day, the United States Department of Health and Human Services      ("HHS")      declared      the      same.      See, https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.[2]  The  outbreak

---

[2] The Declaration stated as follows: "Determination that a Public Health Emergency Exists.  As a result of confirmed cases of 2019 Novel Coronavirus (2019-nCoV), on this date and after consultation with public health officials as necessary, I, Alex M. Azar II, Secretary of Health and Human Services, pursuant to the authority vested in me under section 319 of the Public Health Service Act, do hereby determine that a public health emergency exists and has existed since January 27, 2020, nationwide."

Rodríguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 3

was officially classified as a pandemic by the WHO on March 11, 2020.   See,

https://www.who.int/news/item/27-04-2020-who-timeline---covid-19 (last visited October 13,

2021).   Later that month, then Governor Wanda Vázquez issued a Declaration of Emergency in

Puerto Rico citing the WHO and HHS declarations.   See, EO 2020-020.   On March 13, 2020,

President Donald Trump declared a national emergency.   See, Proclamation 9994.[3]   The pandemic

has affected public health systems, as well as the daily individual, social, and economic life of all

persons, not only in Puerto Rico, but in the United States, and the rest of the world.

Worldwide, COVID-19 has infected almost 230 million people and caused over four million

deaths, with these numbers still changing daily.   See, https://covid19.who.int/ (last visited September

24, 2021).   In the United States, the virus has infected over 33.5 million persons, and over 600,000

have died.   Id.   Since March 2020, Puerto Rico has had 150,598 confirmed cases; 32,263 probable

cases; and 3,199 deaths.   See, https://www.salud.gov.pr/estadisticas_v2#casos (confirmed and

probable cases); https://www.salud.gov.pr/estadisticas_v2#defunciones (deaths).   A spike in cases

occurred in 2021 as a result of the Delta variant of the virus.

COVID-19 "caught the world unaware."   Klaassen v. Trustees of Indiana University, ---

F.Supp.3d----, 2021 WL 3073926, *8 (N.D. Ind. July 18, 2021).   Initially, "there were no vaccines

or treatments, and testing was expensive and difficult to secure."   Id.   Four days after the HHS

declared a public health emergency, it issued a second declaration allowing the United States Food

and Drug Administration ("FDA") to grant emergency use authorizations ("EUAs") for medical

devices and interventions to combat the pandemic.   See, 85 Fed.Reg. 7316, 7316-7317, 85 Fed.

Reg. 18250, 18250-18251.   In the United States, three vaccines moved to the forefront: two using

---

[3] President Trump made the National Emergency retroactive to March 1, 2020.   To date, all 50 states and territories of the United States as well as the District of Columbia have declared emergencies.

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 4

mRNA technology and one using a viral vector.  See, Klaassen, 2021 WL 3073926 at *8 (noting

development).  Pfizer's and Moderna's vaccines use mRNA, a novel type of vaccine, but one based

on decades of research using easily accessible materials found already in many laboratories.  Id.

Johnson & Johnson' vaccine is a viral vector vaccine, implementing technology from the 1970's

that uses a modified version of a virus to teach the immune system how to respond.  Id.

On November 20, 2020, Pfizer applied for an EUA, which the FDA granted on December

11, 2020.  See, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-

2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine.  On August 23, 2021, the FDA

approved the Pfizer vaccine for use in individuals 16 years and older (Docket No. 51, ¶ 12).  On

November 30, 2020, Moderna applied for an EUA, which the FDA granted on December 18, 2020.

See,        https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-

covid-19/moderna-covid-19-vaccine.   On February 4, 2021, Janssen, a Johnson & Johnson

company, applied for an EUA, which the FDA granted on February 27, 2021.  See,

https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-

19/janssen-covid-19-vaccine.

As of October 12, 2021, 403,576,826 doses of vaccine had been administered, including to

187.7 million people in the United States, so that 56.5% percent of the total population in the

United     States     is     fully     vaccinated.      See,     https://covid.cdc.gov/covid-data-

tracker/#vaccinations_vacc-total-admin-rate-total.  Of adults over the age of 18, 67.9% are fully

vaccinated.  Id.  In Puerto Rico, 2,507,606 doses have been administered and 2,272,550 or 79.8%

of     those     over     the     age     of     twelve     are     fully     vaccinated.      See,

https://www.salud.gov.pr/estadisticas_v2#vacunacion.  The Centers for Disease Control ("CDC")

recommends that all persons older than 12 years old vaccinate against COVID-19 as soon as

possible to be protected from both the illness and the severe complications that could occur.  See,

https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness.

**B. EO 2021-058**

On July 28, 2021, the Governor of Puerto Rico issued EO 21-058, to address the spike of

positive cases, hospitalizations, and death tolls resulting from the Delta variant.   See,

https://www.estado.pr.gov/es/ordenes-ejecutivas/.  He acted pursuant to Section 5.10 of the Puerto

Rico Public Safety Department Act, Law No. 20 of April 10, 2017, which empowers him to, upon

declaring a state of emergency or a disaster, promulgate measures as are necessary to manage said

emergency, which shall be in effect for the duration of the emergency to protect the safety, health,

and property of all the citizens of Puerto Rico.  See, Sec. 5.10 of Law No. 20.

Section 1 of EO 21-058 requires public employees of the Executive Branch that work in-

person to be vaccinated in order to safeguard the health and lives of their peers and of all the

citizens that seek in-person services in government agencies.  Taking that into account, Section 1

requires that those employees be fully vaccinated by September 30, 2021.  The requirement is

satisfied by providing a copy of the "COVID-19 Vaccination Record Card" or a document attesting

to the completion or beginning of the vaccination process (Docket No. 11-1, pp. 9-10).

Section 2 of EO 21-058 puts in place medical and religious "opt-outs" for public employees

that do not want to be inoculated with a COVID-19 vaccine.  First, the medical exemption provides

that employees whose immune system is compromised, are allergic to vaccines, or have a medical

contraindication to the receipt of the vaccine shall be exempt from the COVID-19 vaccination

requirement, but must provide a certification issued by a physician authorized to practice in Puerto

Rico, who shall also certify the duration of the medical contraindication, and whether it is

permanent or temporary.  Once the contraindication ceases, the employee must comply with the

vaccination mandate established in the Executive Order (Docket No. 11-1, p. 10).  Second, the religious exemption provides that the employee may refuse vaccination on the basis of religious beliefs if the vaccines are against the employee's religious observance.  In that case, the employee must furnish an affidavit of religious objection whereby the employee, together with the minister or spiritual leader of her church or religion, state under oath and under penalty of perjury that on the basis of her religious beliefs, the employee cannot receive a COVID-19 vaccine.  Id. at 10-11. Public employees that opt to invoke one of these exemptions must provide a weekly negative SARS-CoV2 test (Nucleic Acid Amplification Test and antigen tests) performed within the last 72 hours.  Id. at 11.

Section 3 of EO 21-058 provides a general "opt-out" for public employees that refuse to inoculate for any personal reason.  It states that any government employee who fails to furnish the COVID-19 Vaccination Record Card or document attesting to the completion or beginning of the vaccination process, shall be responsible for furnishing on the first business day of each week for the duration of the emergency, a negative COVID-19 test result from a qualified virus test SARS-CoV2 (Nucleic Acid Amplification Test and antigen tests) performed within the last 72 hours (Docket No. 11-1, p. 11).  Also, Section 3 expresses that employees who do not furnish the COVID-19 Vaccination Record Card or the weekly negative COVID-19 test result may not work in person. Id. at 12.  Nevertheless, those employees may use compensatory time or available regular leaves of absence as may apply to their situation, and if they have depleted accrued leaves, they may request an unpaid leave of absence.  Id.

## II.     PROCEDURAL BACKGROUND

On August 11, 2021, plaintiffs initiated this action with the filing of a 52-page "Complaint for Declaratory and Injunctive Relief" (Docket No. 1).  They requested a declaration of illegality

and that the court dispose of the case by granting them permanent injunctive relief.  Id.  They did not request a temporary restraining order or a preliminary injunction.  On August 12, 2021, the court ordered plaintiffs to serve process upon defendant by August 26, 2021, and that defendant answer or otherwise plead not later than 14 days after service of process (Docket No. 4).[4]  On August 16, 2021, plaintiffs filed a 55-page Amended Complaint for Declaratory and Injunctive Relief (Docket No. 11).  It did not include and was not accompanied by an application for a temporary restraining order or preliminary injunction.  On August 17, 2021, defendant filed a motion for extension of time to answer or otherwise plead by August 31, 2021 (Docket No. 12), which the court granted the same day (Docket No. 14).  On August 17, 2021 at 10:52 p.m., plaintiffs filed a motion for preliminary injunction (Docket No. 16).

On August 18, 2021, the court scheduled a status conference for August 19, 2021, with instructions for the parties to file a joint informative motion with stipulations by August 26, 2021 and a joint informative motion identifying witnesses and expert witnesses by August 30, 2021 (Docket No. 18).  During the status conference, defendant expressed concern about the joint motions, pointing out that it would move to dismiss and opposed the request for preliminary injunction by the date the court had set, that is, August 31, 2021 (Docket No. 19).  Plaintiffs objected to defendant's request.  Id.  After discussion, the court permitted defendant to move as anticipated and modified the order at Docket No. 18, so that plaintiffs provide defendant with the proposed stipulations and information on witnesses and expert witnesses as stated in the original order on the subject (Docket No. 19).

---

[4] Normally, the summons and complaint must be served within 90 days after the complaint is filed and the defendant must file a responsive pleading or otherwise plead within 21 days after being served with the summons and complaint.  See, Fed.R.Civ.P. 4(m)(service of process); Fed.R.Civ.P. 12(a)(1)(A)(i)(responsive pleading).  Considering the allegations, in its discretion the court shortened those terms.

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 8

On August 31, 2021, defendant moved to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) (Docket No. 20) and in opposition to the request for preliminary injunction (Docket No. 22).  On September 1, 2021, the court ordered that with respect to the motion to dismiss, plaintiffs could oppose the motion by September 9, 2021, defendant could reply not later than three workdays after filing of the opposition, and that any sur-reply had to be filed not later than two workdays thereafter (Docket No. 26).  Furthermore, it ordered that by September 7, defendant list the specific paragraphs of the amended complaint that in his view should be considered "well pleaded" for purposes of Fed.R.Civ. P. 12(b)(6) (Docket No. 27) and indicate the source(s) and section(s) therein of the empirical, statistical and scientific data included in the "Whereas" Section of EO 21-058.  Id.  On September 3, 2021, it scheduled a status conference for September 10, 2021 (Docket No. 28).

On September 7, 2021, defendant filed an informative motion regarding paragraphs in the amended complaint that should be considered well pleaded for purposes of Fed.R.Civ.P. 12(b)(6) (Docket No. 29), and a motion indicating the sources and sections therein of the empirical, statistical and scientific data included in the WHEREAS Section of EO 21-058 (Docket No. 30). The same day, plaintiffs replied to defendant's opposition to the motion for preliminary injunction (Docket No. 32).  On September 9, 2021, defendant sur-replied to plaintiffs' reply to the opposition to the preliminary injunction request (Docket No. 40).

On September 10, 2021, the court held as scheduled the status conference set at Docket No. 28.  During the conference, it indicated that it had reviewed all of the filings, and with the benefit of those filings, set a preliminary injunction hearing for September 21, 2021; a pre-conference hearing for September 20, 2021; and a September 17, 2021 deadline for the parties to file a joint information motion with stipulations and information regarding witnesses and

documentary evidence to be used during the hearing, and for plaintiffs to file a motion specifying what they are challenging on its face and as applied to their case.

On September 14, 2021, defendant replied to plaintiffs' opposition to the motion to dismiss (Docket No. 45). On September 16, 2021, plaintiffs sur-replied to that reply (Docket No. 48). On September 17, 2021, they filed the motion clarifying what it is that they challenge on its face and as applied (Docket No. 50), which was later amended at Docket No. 57. Likewise, the parties filed the joint informative motion regarding stipulations, witnesses and expert witnesses (Docket No. 51).

On September 21, 22, 23, 24, 27 and 28, 2021, the court held a preliminary injunction hearing, during which it provided the parties with ample opportunity to put forward evidence (Docket Nos. 79, 80, 81, 82, 83 and 84). In addition to their own testimony, Plaintiffs presented the testimony of 6 other witnesses, including 2 expert witnesses and 24 exhibits, whereas defendant introduced the testimony of 2 expert witnesses and 10 exhibits. Id.[5] On September 25, 2021, the "Asociación de Alcaldes de Puerto Rico" (Mayors Association of Puerto Rico) filed an amicus brief in support of the defendant (Docket Nos. 64, 70). On September 30, 2021, the court heard closing arguments (Docket No. 85).

On October 1, 2021, plaintiffs filed a copy of Dr. Hay's report (Docket No. 90-1). On October 4, 2021, they asked the court to take judicial knowledge of 60 items (Docket No. 92).

---

[5] Plaintiffs' expert witnesses were Dr. Andrew G. Bostom and Dr. Joel W. Hay. Defendant's expert witnesses were Dr. Iris R. Cardona and Dr. Melissa Marzán. Dr. Bostom is Associate Professor of Research at the Warren Alpert Medical School at Brown University (Docket No. 73, p. 32); Dr. Hay is Full Professor of Health Economics and Pharmaceutical Economics at the University of Southern California in Los Angeles (Docket No. 74, p. 4); Dr. Cardona is the Chief Medical Officer of the Puerto Rico Department of Health, Incident Commander of the COVID-19 Vaccination Plan, and member of the Scientific Coalition, which advises the Governor of Puerto Rico on issues related to COVID-19 (Docket No. 71, pp. 7, 9); Dr. Marzán is the Chief Epidemiological Officer of the Puerto Rico Department of Health (Docket No. 106, p. 120).

Further, the Liberty Justice Center requested leave to file an amicus brief in support of plaintiffs'

motion for a preliminary injunction and opposition to defendant's motion to dismiss (Docket No.

97).  The same day, the court granted the Center's request (Docket No. 98).  On October 5, 2021,

the Center filed its brief (Docket No. 99).  On October 8, 2021, defendant responded to plaintiffs'

motion for judicial knowledge, accepting or partially accepting some of the items presented in

plaintiffs' motion and rejecting others (Docket No. 111).  On October 12, 2021, plaintiffs replied

to defendant's response (Docket No. 114).

### III.   DISCUSSION

### A.  Preliminary Injunction

Plaintiffs moved for a preliminary injunction (Docket No. 16).   Injunctive relief is an

extraordinary and drastic remedy that is "never awarded as of right." Peoples Federal Sav. Bank

v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012); Sindi v. El-Moslimany, 896 F.3d 1, 29

(1st Cir. 2018).  Whether to issue a preliminary injunction depends on four factors: (1) plaintiff's

likelihood of success on the merits; (2) the potential for irreparable harm in the absence of

preliminary injunctive relief; (3) whether issuing the injunction will burden defendants less than

denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest.

See, Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir.

2012)(articulating and applying test); New Comm Wireless Services., Inc. v. SprintCom, Inc., 287

F.3d 1, 8-9 (1st Cir. 2002)(similar).  Plaintiffs "bear[ ] the burden of establishing that these four

factors weigh in [their]favor." Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d

13, 18 (1st Cir. 2006).

Likelihood of success on the merits is the "main bearing wall on this framework." W

Holding Co., Inc. v. AIG Ins. Co. -Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014); Ross-Simons of

Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).[6]  Irreparable harm is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood shown."  Braintree Laboratories, Inc. v. Citigroup Global Markets, Inc., 622 F.3d 36, 42-43 (1st Cir. 2010).

### (1)  First Prong: Likelihood of Success

#### a.  Fourteenth Amendment's Due Process Clause

Plaintiffs allege that the vaccine mandate violates the Due Process Clause of the Fourteenth Amendment (Docket No. 11, p. 41; Docket No. 16, p. 9).  The Due Process Clause prohibits a state from depriving a person of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  This Guarantee has a "substantive and a procedural" component.  Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006); Bibiloni Del Valle v. Puerto Rico, 661 F.Supp.2d 155, 182-183 (D.P.R. 2009).  The substantive component "functions to protect individuals from particularly offensive actions on the part of government officials even when the government employs facially neutral procedures in carrying out those actions."  Pagán, 448 F.3d at 32.  The procedural component protects against deprivation of a protected liberty or property interests without a "constitutionally adequate process."  González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011).  The Guarantee extends to Puerto Rico as if the Commonwealth were a state of the United States.  See, González-Droz, 660 F.3d at 9-10 (for purpose of the Due Process Clause Puerto Rico is "the

---

[6] See also, Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020)("We hasten to add that these four elements are not of equal prominence in the preliminary injunction calculus.  The most important is whether the movant has demonstrated a likelihood of success on the merits – an element that we have described as the '*sine qua non*' of the preliminary injunction inquiry")(internal citations omitted).

functional equivalent of a state"); Pagán, 448 F.3d at 32 (applying Due Process Clause in claim

against Governor of Puerto Rico).

### i.   Substantive Due Process

Plaintiffs argue that the vaccine mandate unconstitutionally affects their liberty interests in

personal autonomy, bodily integrity and medical choice (Docket No. 16, p. 9).  In Jacobson v.

Commonwealth of Massachusetts, 197 U.S. 11 (1905), the Supreme Court evaluated the

constitutionality of a vaccine mandate.  The case arose out of a smallpox epidemic, in response to

which, based on a Massachusetts statute, the board of health of Cambridge adopted a regulation

requiring its inhabitants to be vaccinated against smallpox.  Much like plaintiffs here, the plaintiff

in that case challenged the mandate, arguing that "a compulsory vaccination law is unreasonable,

arbitrary and oppressive, and therefore, hostile to the inherent right of every freeman to care for

his own body and health in such way as to him seems best; at that the execution of such a law

against one who objects to vaccination, no matter for what reason, is nothing short of an assault

upon his person."  Id. at 26.

The Supreme Court rejected the argument, validating the mandate as a valid exercise of the

State's police power.  It observed that the liberty secured by the Constitution of the United States

to every person within its jurisdiction does not import an absolute right in each person to be, at all

times and in all circumstances, wholly freed from restraint.  It pointed out that there are manifold

restraints to which every person is necessarily subject to for the common good, and that "[o]n any

other basis, organized society could not exist with safety to its members." Id. at 26. It recognized

that real liberty for all could not exist under the operation of a principle which recognizes the right

of each individual person to use his own, whether in respect of his person or his property, regardless

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 13

of the injury that may be done to others.  Id. For the Court, "[s]ociety based on the rule that each

one is a law unto himself would soon be confronted with disorder and anarchy." Id.

Furthermore, the Supreme Court indicated that there is a sphere within which the individual

may assert the supremacy of his own will, and rightly dispute the authority of any human

government – especially of any free government existing under a written constitution – to interfere

with the exercise of that will, but that it is equally true that in every well-ordered society charged

with the duty of conserving the safety of its members, the rights of the individual in respect of his

liberty may at times, under the pressure of great danger, be subjected to such restraint, to be

enforced by reasonable regulations, as the safety of the general public may demand.  That being

so, the Court expressed that it is not true that the power of the public to guard itself against

imminent danger depends, in every case involving the control of one's body, upon his willingness

to submit to reasonable regulations established by the constituted authorities, under the sanction

of the state, for the purpose of protecting the public collectively against such danger.  Id. at 29-30.

Refining its analysis, the Supreme Court saw that the vaccination mandate could not have

applied to an adult where vaccination would exacerbate a "particular condition of his health or

body. . ." Jacobson, 197 U.S. at 38-39.  As importantly, the Court disclaimed any judicial power

to second-guess the state's policy choices in crafting emergency public health measures, given that

"[i]t is no part of the function of a court or a jury to determine which one of two modes was likely

to be the most effective for the protection of the public against disease."  Id. at 30.  As well, the

Court declared that review is "only" available "if a statute purporting to have been enacted to

protect the public health, the public morals, or the public safety, has no real or substantial relation

to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the

fundamental law."  197 U.S. at 31.

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 14

With this backdrop, the Supreme Court remarked that the state proceeded on a theory which recognized vaccinations as at least an effective, if not the best-known, way in which to meet and suppress the evils of a smallpox epidemic that imperiled an entire population, adding that whatever may be thought of the expediency of this provision, it could not be affirmed to be, beyond question, in palpable conflict with the Constitution.  In connection with the method the government employed to stamp out the disease, the Court mentioned that no one could confidently assert that the means prescribed by the state to that end had no real and substantial relation to the protection of the public health and the public safety.  Id. at 31.  To boot, the Court declared that:

> While this court should guard with firmness every right appertaining to life, liberty, or property as secured to the individual by the supreme law of the land, it is of the last importance that it should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law.  The safety and health of the people of Massachusetts are, in the first instance, for that commonwealth to guard and protect. [ . . . .] **[W]e do not perceive that this legislation has invaded any right secured by the Federal Constitution.**  Id. at 38 (emphasis added).

Jacobson commands a deferential standard for analyzing Fourteenth Amendment challenges to public health measures like the one at bar.  Pursuant to this standard, courts may not overturn public-health measures adopted in a health crisis unless those measures lack a "real or substantial relation" to public health and safety or are "beyond all question, a plain palpable invasion of rights secured by the fundamental law." 197 U.S. at 31.  Likewise, judicial intervention is warranted when the measures are so "arbitrary and oppressive" as to go "far beyond [what is] reasonably required for the safety of the public." Id. at 28, 38.  Properly read, the vaccination mandate satisfies Jacobson's parameters of validity.

The Governor has a legitimate interest in protecting public health.  Responding to the pandemic in order to curb the spread of the virus is considered a compelling state interest.  See,

Roman Catholic Diocese of Brooklyn v. Cuomo, ---U.S.----, 141 S.Ct. 63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling state interest. . . "); Does v. Mills, ---F.4th ----, 2021 WL 4860328, *7 (1st Cir. Oct. 19, 2021), *cert denied* 595 U.S.---- (October 29, 2021) ("Few interests are more compelling than protecting public  health against a deadly virus").  As a tool to curb the spread, the mandate bears a real and substantial relation to this public health objective.  See, Does, 2021 WL 4860328 at *1, *6 (vaccination mandate for healthcare workers in response to COVID-19 promotes goal of protecting the health and safety of residents of state, of patients, and of healthcare workers); Klaassen 2021 WL 3073926 at *21 (recognizing link between vaccine and elimination of communicable disease in context of COVID-19 vaccination mandate in state university).

The vaccines meet the FDA's "rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support approval or authorization of a vaccine."  Bauer v. Summey, ---F.Supp.3d----, 2021 WL 4900922, *10 (D.S.C. Oct. 21, 2021).  Extensive data supports vaccination as an effective strategy for preventing severe illness, hospitalization, and death from COVID-19."  Id. at *12.  And the mandate does not involve a plain, palpable invasion of rights secured by the Constitution.  See, Zucht v. King, 260 U.S. 174, 176 (1922)(rejecting challenge to ordinances requiring certificate of vaccination to attend public schools and other places of education as, among other things, Jacobson "had settled that it is within the police power of a state to provide for compulsory vaccination); Klaassen v. Trustees of Indiana University, 7 F.4th 592, 593-594 (7th Cir. 2021)(Easterbrook, J.)(denying stay pending appeal of ruling adverse to plaintiffs in connection with university vaccination mandate in part because in light of Jacobson, and that vaccination requirements have been common in the United States, "there [cannot] be a constitutional problem with vaccination against SARS-CoV-2 [COVID-19]"); Phillips v. City of

New York, 775 F.3d 538, 542-543 (2d Cir. 2015)(turning down on the basis of Jacobson a

substantive due process challenge to school vaccination mandate).

      Yet, that is not all.  Jacobson did not countenance an "absolute rule that an adult must be

vaccinated if it [were] apparent or [could] be shown with reasonable certainty that he is not at the

time a fit subject of vaccination, or that vaccination, by reason of his then condition, would

seriously impair his health, or probably cause his death."  197 U.S. at 366-367.  Recognizing this

aspect of Jacobson, Justice Gorsuch observed that Mr. Jacobson's constitutional challenge to the

vaccine mandate would still not prosper today, for "[t]he imposition on Mr. Jacobson's claimed

right to bodily integrity was "avoidable and relatively modest." Roman Catholic Diocese of

Brooklyn, 141 S.Ct. at 71 (Gorsuch, J., concurring).  On that basis, the imposition "easily survived

rational basis review, and might even have survived strict scrutiny, given the opt outs available for

certain objectors." Id.

      So too here, considering that the vaccination requirement set in EO 21-058 is accompanied

by exceptions for persons with medical conditions, religious beliefs, and personal preference

against vaccination – that is, by mechanisms crafted to accommodate employees who opt not to

vaccinate.  That is not arbitrary or oppressive but reasonable, the antithesis of a plain, palpable

invasion of rights secured by the Constitution.[7]   Indeed, this mandate is more liberal toward

---

[7] Plaintiffs allege that the mandate is arbitrary and capricious because different public officials have interpreted EO 21-058 differently (Docket No. 11, ¶¶ 23-28).  They refer to a Press Release issued by the Governor's Office noting that EO 21-058 contains 2 exceptions: one for persons with medical conditions and one for persons who, for religious reasons, decide not to get vaccinated (id., ¶ 24).  Also, they mention a Puerto Rico Justice Department Memorandum to its employees requiring medical certificates or affidavits to accredit exemptions and stating that in those cases the employees must submit weekly test results; and to Special Normative Letter (Letter 2-21) from the Administration and Transformation Office to the effect that an employee is required to submit an affidavit only if the employee invokes a medical condition or religious faith as grounds not to vaccinate but otherwise may work in person by submitting weekly COVID tests. Id. at ¶ 23.  Further, they aver that plaintiff Julissa Piñero was told by her supervisor that if she preferred submitting weekly tests instead of getting vaccinated, she needed a medical certificate from her physician or an affidavit from her spiritual leader (id. at ¶ 25), and that the Human Resources Department of the Gaming Commission told plaintiff Yohama González that no affidavit was needed if she submitted the negative COVID-19

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 17

employees than the one evaluated in <u>Does</u>, 2021 WL 4860328 at *1, where the First Circuit

sustained denial of a request for preliminary injunction against implementation of a vaccine

mandate for healthcare workers, even though the mandate did not include exemptions based on

religious beliefs or philosophical grounds.

Plaintiffs argue the court should not apply <u>Jacobson</u>'s "more-than-a-century old" standard

of review (Docket No. 42, pp. 10-11).  The Supreme Court has not ruled on whether <u>Jacobson</u> is

valid today even though, since the pandemic began, that case has been cited by the Justices in both

concurrences and dissents.  <u>See</u>, <u>South Bay United Pentecostal Church</u> v. <u>Newsom</u>, ---U.S.----, 140

S.Ct. 1613 (2020)(Mem.) (Roberts, C.J., concurring in denial of application for injunctive

relief)(quoting <u>Jacobson</u> to the effect that our Constitution principally entrusts "[t]he safety and

the health of the people" to the politically accountable officials of the States "to guard and

protect"); <u>Calvary Chapel Dayton Valley</u> v. <u>Sisolak</u>, ---U.S.----, 140 S.Ct. 2603, 2608

(2020)(Mem.)(Alito, J., dissenting from denial of application for injunctive relief)(observing that

"it is a mistake to take language in <u>Jacobson</u> as the last word on what the Constitution allows public

officials to do during the COVID-19 pandemic.  Language in <u>Jacobson</u> must be read in context,

and it is important to keep in mind that <u>Jacobson</u> primarily involved a substantive due process

challenge to a local ordinance requiring residents to be vaccinated for smallpox. It is a considerable

stretch to read the decision as establishing the test to be applied when statewide measures of

---

results on a weekly basis.  <u>Id.</u>  Plaintiffs assert that this demonstrates that the Puerto Rico Government is willing to do anything, even by deceit, to force plaintiffs and other Puerto Ricans to get vaccinated.  <u>Id.</u> at ¶ 29.  That different public officials may have read the Executive Order differently is not evidence of deceit by the Government of Puerto Rico or that the Executive Order is arbitrary or capricious.  Lack of complete uniformity is unavoidable in large bureaucratic settings.  Different officials may act differently, not "identically in every case."  <u>South Shore Hosp., Inc.</u> v. <u>Thompson</u>, 308 F.3d 91, 103 n.7 (1st Cir. 2002).  A certain amount of asymmetry is not unlawful.  <u>Id.</u>  In any event, EO 21-058 announces what its text states, and in the present case, the Governor has expressed his position on this matter, which dispels any misunderstanding regarding the text of the Executive Order.  No agency has asked plaintiffs to submit affidavits, and they have not done so.

indefinite duration are challenged under the First Amendment or other provisions not at issue in that case"); Roman Catholic Diocese of Brooklyn, 141 S.Ct. at 70 (Gorsuch, J., concurring in decision to grant application for injunctive relief)(pointing out that Jacobson "involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction"). In this last case, the Supreme Court granted temporary injunctive relief to New York-based religious entities against Governor Cuomo's strict capacity limits on in-person services. See, 141 S.Ct. at 63. In the process, the Court evaluated the plaintiffs' First Amendment free exercise claim under a traditional constitutional analysis, concluding that strict scrutiny applied because the Governor's religious restrictions had singled out houses of worship. Id. at 66-68. Notably, however, the Court's *per curiam* opinion does not mention Jacobson.

At a different level, the First Circuit has yet to analyze the applicability of Jacobson to COVID-19-related mandates. To be sure, in Does, 2021 WL 4860328 at *1, *11, it affirmed the district court's denial of a request for a preliminary injunction to enjoin on free exercise and equal protection grounds a regulation requiring all healthcare workers to be vaccinated against COVID-19, with the exception of workers for whom a vaccine was not medically contraindicated. Id. at *1, 8. But the opinion only cites Jacobson once, for the proposition that eliminating that exemption "would likely be unconstitutional itself." Id.

Still, courts around the country, including within the First Circuit, have relied on Jacobson to validate public-health-related orders adopted in response to the pandemic. See, Big Tyme Investments, L.L.C. v. Edwards, 985 F.3d 456 (5th Cir. 2021)(applying Jacobson to reject challenge to bar closure order); In re Rutledge, 956 F.3d 1018, 1028 (8th Cir. 2020)(finding that a district court's "failure to apply the Jacobson framework produced a patently erroneous result"); League of Independent Fitness Facilities and Trainers, Inc. v. Whitmer, 814 Fed.Appx. 125, 127-

128, 130 (6th Cir. 2020)(relying on "century-old historical principle" set in Jacobson to grant governor's motion to stay preliminary injunction entered against executive order closing indoor facilities in response to COVID-19); Stewart v. Justice, 502 F.Supp.3d 1057, 1063 (S.D.W. Va. 2020)("Although Jacobson is more than a century old, recent case law shows that it is still good law"); Forbes v. County of San Diego, 2021 WL 843175, *4 (S.D. Cal. Mar. 4, 2021 ("Because Jacobson remains good law, the Court will apply it to [p]laintiff's substantive due process claim"); Antietam Battlefield KOA v. Hogan, 461 F.Supp.3d 214, 228 (D. Md. 2020), *appeal dismissed sub. nom.*, No. 20-1579, 2020 WL 6787532 (4th Cir. July 6, 2020)("Since the challenged orders are public health measures to address a disease outbreak, Jacobson provides the proper scope of review"); Altman v. County. of Santa Clara, 464 F.Supp.3d 1106, 1118 (N.D. Cal. 2020)(rejecting assertion that Jacobson was merely "arcane constitutional jurisprudence" in challenge to municipal shelter-in-place order issued during the pandemic); AJE Enterprises LLC v. Justice, 2020 WL 6940381, *2-*4 (N.D.W. Va. Octo. 27, 2020)(turning down plaintiffs' attempt to discount the vitality of Jacobson).

As for courts within the First Circuit applying Jacobson, see, Delaney v. Baker, 511 F.Supp.3d 55, 71 (D.Mass. 2021) (sustaining under Jacobson the constitutionality of executive orders issued after declaration of state of emergency during COVID-19 pandemic, which addressed, *inter alia*, size of gatherings, occupancy limits, workplace safety protocols, and face coverings); Savage v. Mills, 478 F.Supp.3d 16, 30 (D. Me. 2020)(citing Jacobson as support to validate executive orders related to COVID-19 pandemic that imposed partial shutdown of the State, and mass quarantine of its citizens); America Cruise Ferries, Inc. v. Vázquez Garced, 2020 WL 7786939, *15-*18 (D.P.R. Dec. 17, 2020)(following Jacobson to reject challenge to executive order suspending maritime passenger and vehicle transportation service in light of COVID-19);

Harris v. University of Massachusetts, 2021 WL 3848012, *6-*8 (D. Mass. Aug. 27, 2021)(same with respect to mandatory vaccination policy in state university), *appeal filed,* No. 21-1770 (1st Cir. September 28, 2021).[8]  Given this consensus, in the absence of fundamental rights – and, as explained below, none has been invoked or is in operation in this case – Jacobson applies.

Plaintiffs claim that E0 21-058 fails the Jacobson test because the circumstances in Puerto Rico are unlike those in Jacobson (Docket No. 16, p. 12).  They assert that the case fatality rate (the proportion of deaths compared to total diagnosis) in the city of Boston when Jacobson was decided was over 16% (1,596 cases of smallpox with 270 deaths, in a city with a population close to 561,000.  Comparatively, from January 21, 2020 to August 17, 2021 in Puerto Rico, the death rate was 83 per 100,000, the case fatality rate 2% with 5 average daily deaths, and from June 1, 2021 until August 17, 2021, with 60% of people fully vaccinated, the case fatality rate was 1.3% with 2 average daily deaths (Docket No. 16, p. 12).  They state that Puerto Rico's healthcare system was never in jeopardy of being overwhelmed during the worst part of the pandemic in pre-vaccine times, and thus, the data does not support the vaccination requirement (id. p. 17) and complain that requiring a negligible number of people to become vaccinated goes "beyond what [i]s reasonably required for the safety of the public" (Docket No. 11, p. 43).

On November 23, 2020, Puerto Rico experienced a 7-day moving average (7-dMA) of 847.6 daily confirmed cases.  See, https://www.salud.gov.pr/estadisticas_v2#casos (last visited on October 27, 2021).[9]  The figure went down but increased thereafter, reaching 782.4 on April 17,

---

[8] See also, Dr. T. v. Alexander Scott, 2021 WL 4476784, *2 (D.R.I. Sept. 30, 2021)(citing Jacobson and other cases in support of proposition that courts have held for over a century that mandatory vaccination laws are a valid exercise of a state's police powers, and that such laws have withstood constitutional challenges, in denying request for preliminary injunction against enforcement of regulation requiring all healthcare workers except those meeting a very narrow medical exception, to be vaccinated against COVID-19).

[9] The 7-dMA is used to adjust for day-of-week reporting lags, such as non-reporting on weekends (Docket No. 90-1,

2021, after which it dropped but started climbing in June 2021.  Id.  As of August 14, 2021, the figure stood at 623 confirmed daily cases; and on August 16, 2021, at 605.7.  Id. On June 25, 2021, the estimated positivity rate was 1.3%; on July 25, 2021, 6.73%; on July 29, 2021, 8.54%; on August 11, 2021, 11.27%, and on August 16, 2021, 10.83%.  See, https://www.salud.gov.pr/estadisticas_v2#resumen_ejec (last visited on October 27, 2021) and https://www.salud.gov.pr/estadisticas_v2#pruebas (Positividad) (last visited on October 28, 2021).[10]  On November 10, 2020, the 7-dMA of daily new admissions of patients with COVID-19 was 189; on April 27, 2021, 47; on May 17, 2021, 16; on August 1, 2021, 15; and on August 16, 2021, 27.  See, Docket No. 92, p. 9, ¶¶ 29, 30 and 31.  Since March 2020, Puerto Rico has 3,227 accumulated deaths related to COVID-19.  See, https://www.salud.gov.pr/estadisticas_v2#defunciones (last visited on October 27, 2021).  As of June 1, 2021, the total was 2,524; by July 1, 2021, 2,560; by July 28, 2021, 2,583; and by August 16, 2021, 2,704.  See, https://www.salud.gov.pr/estadisticas_v2#defunciones (Defunciones por COVID-19 a través del Tiempo con Media Móvil) (last visited on October 28, 2021). On December 12, 2020, the 7-dMA average of daily deaths was 16.7; on April 22, 2021, 9.9; on June 1, 2021, 3.1; on July 1, 2021, 1; on July 25, 2021, 1.1; on August 16, 2021, 9.4; and on September 1, 2021, 14.3.  See, https://www.salud.gov.pr/estadisticas_v2#defunciones (last visited on October 27, 2021).  EO 21-058 focuses on and looks at these changing circumstances, identifying the increase in daily average of cases, positivity rates, hospitalizations, and death toll, as in need of response to

---

¶ 86).

[10] On July 28, 2021, the Effective Transmission Rate was 1.40.  On August 11, 2021, it was 0.98, and on August 16, 2021, it was 0.88.  Rt is the average number of people that an individual infected on day $t$ is expected to infect.  When Rt is above 1, cases are expected to increase in the near future.  When it is below one, cases are expected to decrease in the near future.

protect the life and safety of citizens from the health consequences of the infection.  See, EO 21-058 (Docket No. 11-1, at pp. 1-2).

Plaintiffs' expert, Dr. Hay, took issue with the vaccination mandate, expressing that between November 1, 2020 and May 31, 2021, the daily average of 7-dMA was 400 confirmed cases per day, and between June 15, 2021 and September 29, 2021, 254 confirmed cases per day (Docket No. 90-1, p. 23).  He explained that a first surge occurred in November 2020 with an average 7-dMA of 684 cases, followed by a second surge in April 2021 with an average 7-dMA of 607 cases, and a surge in August 2021 with an average 7-dMA of 500 cases, with patterns reflecting that the most recent wave of infections was not only less severe but did not last as long as previous waves.  Id. at 25.  Citing William Farr, he noted that epidemics follow a natural bell-shaped curve, reaching a maximum and slowly declining, and that any interventions only delay the inevitable rise and subsequent fall of cases.  Id.

Dr. Hay characterized COVID-19 deaths as "minimal" (Docket No. 90-1, p. 34).  He indicated that since April 1, 2020, the 7-dMA of confirmed COVID-19 deaths has never exceeded 15 deaths in a single day, and when looking at the 7-dMA of COVID-19 deaths, there is virtually no change over time in the daily rate of change based on that moving average since April 2020, with the daily change in the 7-dMA of deaths never exceeding +/- 2 at any given point throughout the entire pandemic.  Id. at pp. 34-35.  He pointed out that the daily rate of change has been decelerating, that is, slowing down since July 1, 2021.  Id. at 35.  In his view, while there was an initial increase in confirmed cases since July 1, 2021, this was a consequence of the natural course of the virus, and that the role of change in cases and deaths was decelerating by July 1.  Id. at 42. He remarked that despite having far lower cases in Puerto Rico compared to other areas of the United States, the CDC ranks Puerto Rico as a "Level 4: Very High Level of COVID-19 in Puerto

Rico," which Dr. Hay deemed to be "nonsense," as there are no such restrictions for travel to the United States as a whole, or even to specific states.  Id. at 27.

Dr. Hay asserted that Puerto Rico ranks 2nd in the United States in terms of lowest hospital utilization rates for COVID-19 at just 1.8% for hospital beds and 7.3% of Intensive Care Unit beds, representing 2.9% of total inpatient utilization (Docket No. 90-1, p. 31).  He declared that overall, nearly 40% of hospital beds have remained available since August 1, 2020 and nearly 30% of ICU beds have remained available during the same time period.  Id.  He stated that as of September 29, 2021, the number of COVID-19 related hospitalizations has declined by 96% since November 2020, and that this data indicates that new daily hospitalizations are decreasing even with the arrival of the Delta variant, thus precluding any rationale for strict vaccination and testing mandates.  Id. at 32.

Defendant's expert, Dr. Cardona, explained that the vaccination mandate was not automatic (Docket No. 106, pp. 30, 39).  She said that toward June 2021, Puerto Rico seemed to have taken control of the pandemic but there was an increase that she described as exponential, a steep increase in cases, hospitalizations and fatalities.  Id. at 52.  Dr. Cardona pointed out that given the increase, an increase attributable to the Delta variant of the virus, the decision was made to broaden the scope of the mandate, which at that point included health professionals, teachers, and students, in order to include the employees covered by EO 21-058.  Id at 11, 31-32.  She stated that at the time EO 21-058 was issued, the positivity rate was over 7% (id., p. 9), and even though the hospital system was not overwhelmed (id., p. 42), the hospitalization rate was rising and continued growing for 3 or 4 weeks.  Id. at 43.

Dr. Cardona expressed that the mandate is justified until the parameters that are being monitored show that the disease is under control (Docket No. 106, p. 6).  From her perspective,

that will occur when there is a sufficient number of vaccinated people, and when contagion or infections, positivity rate, hospitalizations and deaths are continuously going down for a determined period of time.  Id. at 6-7, 33.  She said that relevant indicators have been falling since early mid-August, right around the time the mandate went into effect, thanks to the mandate.  Id. at 11.  She stated that prior to the executive order here, the student and teacher populations were vaccinated, creating a wave of increasing vaccination (id.), which together with community education linked to in-person, back-to-school at all levels, brought about an initial improvement, and after the executive order went into effect, there has been sustained improvement in the figures. Id. at 11-12.

Dr. Cardona agreed with plaintiffs' counsel that epidemics come in waves. In Puerto Rico, the first wave occurred in November 2020, the second in April 2021, and the most recent in July/August 2021; and the peaks of each of these waves decreased, that is, the highest peak was in the first wave, which went down in the second peak, and in the last peak was the lowest (Docket No. 106, p. 15).  She, however, attributed the phenomenon to the fact that vaccines arrived after November, and with them, a greater number of vaccinated individuals.  Id.  Also, she pointed out that the peaks lasted less time with each successive wave in reaction to preventive measures and vaccination.  Id. at 15-16.

As for William Farr's research, alluded to by Dr. Hay, plaintiffs' counsel asked Dr. Cardona if she agreed that epidemics follow a natural bell-shaped curve, reaching a maximum and slowly declining, and that diseases tend to get more infectious and less lethal over time (Docket No. 106, p. 16).  Dr. Cardona responded that this depended on the infectious agent, and that COVID-19 is not yet getting less lethal regardless of its rate of contagiousness.  Id. at 16-17.  Plaintiffs argue that despite the mandate people would not have stopped vaccinating altogether (Docket No. 106,

p. 45), and affirm that all of the relevant measures were going down before the mandate took effect. Id. at 12.

When EO 21-058 was announced and implemented, the pathogen was infecting, hospitalizing, and killing people.  Plaintiffs' Exhibit 4-11 ("7dMA of Confirmed COVID-19 Cases Since April 1, 2020") shows an upward slope in mid-July 2021, going from 100 up to 250 in early August 2021, and surpassing 500 by mid-August 2021.  Plaintiffs' Exhibit 4-16 ("COVID-19 Hospital Bed Utilization Rate Since August 1, 2020") reflects an increase in bed utilization around the end of July 2021 to about the third week of August 2021.  Plaintiffs' Exhibit 4-20 ("New Admissions of Patients with Confirmed COVID-19, Puerto Rico"), mirrors the same movement of patients into hospitals.  Plaintiffs' Exhibit 4-17 ("COVID-19 ICU Bed Utilization Rate Since August 1, 2020"), reveals that between July-August 2021 numbers went up until around the end of August or beginning of September 2021.  Plaintiff's Exhibit 4-21 ("7dMA of Confirmed COVID-19 Deaths Since April 1, 2020"), shows that in July 2021, 2 persons were dying every day and around the end of July the number went up to more than 12, peaking in early September and descending thereafter.  These exhibits confirm in the form of graphs the increase in the numbers mentioned earlier for each of the parameters that EO 21-058 refers to.  In this light, it was reasonable for the Governor to conclude that COVID-19 posed a serious threat, and that the vaccination policy was appropriate to promote the safety of the community.

Plaintiffs' expert, Dr. Bostom, expressed that it is not appropriate to have mass vaccination strategies in the absence of randomized controlled trial data that are extended long enough in time to look at, not only in potential benefits as to infections, but also in terms of hospitalizations and deaths (Docket No. 73, p. 31),  He indicated that mass vaccination is not appropriate without having studied all-cause mortality, which in his view provides at least some indicator of whether

anything has gone awry, that is, if there are adverse effects from the vaccine.  Id.  He said that none of the trials with COVID vaccines have been large enough or long enough to really evaluate, not just changes in infection rates, but changes in hospitalization rates, changes in COVID mortality rates and changes in all-cause mortality rates.  To this way of thinking, this deficiency is "glaring."  Id. at 32.  He described as "flawed," the FDA's methodology to approve the vaccines.  Id. at 39.  The CDC, however, recommends that everyone aged 12 years and older get vaccinated as soon as possible (Docket No. 51, ¶ 8).

Dr. Bostom testified that natural immunity appears to be more protective in terms of not only asymptomatic infections, but symptomatic infections and hospitalizations (Docket No. 73, pp. 18-19).  Dr. Cardona indicated that there may be a certain level of natural immunity, but it has been documented that it only lasts 3 months (Docket No. 106, pp. 24-25).  She mentioned that a number of patients have received monoclonal antibody treatments, which lasts 90 days.  Id. at 25.  She stated that this is what makes the vaccine recommendable even for those who had the illness.  Id. at 24.  She remarked that if Puerto Rico had established a goal of natural immunity, it would probably have cost many lives, too high a price to pay when there is a vaccine that has been scientifically tested.  Id. at 24.  To that effect, there is "evidence that vaccines provide more robust protection than antibodies from a previous COVID-19 infection," Bauer, 2021 WL 4900922 at *12, and the CDC recommends vaccination even for individuals who have already been infected with COVID-19 and recovered."  Id.

In view of this, EO 21-058 does not run afoul of Jacobson.  See, Klaassen, 2021 WL 3073926 at *36 (noting in denying preliminary injunction against vaccination mandate that policy makers have wide discretion to act in areas where there is medical and scientific uncertainty, and considering the medical and scientific debate over vaccination, defendant acted reasonably in

requiring vaccination to pursue public health and safety for its communities); Bauer, 2021 WL 4900922 at *12 (declining to intervene in scientific debate given that vaccination policy was based on reliable body of scientific evidence, which rationally supported the vaccine policy in question).

Plaintiffs posit that vaccinated people are rarely affected by unvaccinated people, and as more people get vaccinated, the share of cases, hospitalizations, and deaths represented by unvaccinated people will tend to fall, meaning that at bottom, the vaccine mandate is a government attempt to protect the unvaccinated population, who chose to assume the risk of not getting vaccinated, from themselves (Docket No. 16, p. 17).  That argument is not unlike those raised and rejected in challenges to motorcycle headgear and seat belt laws.  See, Picou v. Gillum, 874 F.2d 1519 (11th Cir. 1989) (motorcycle-helmet use law); State v. Hartog, 440 N.W. 2d 852 (Iowa 1989) (seat belt law).

In Picou, the plaintiff argued that motorcycle helmet law infringed upon his right to be left alone and be free from paternalistic legislation aimed at protecting citizens from the consequences of their own behavior and not at protecting others.  See, 874 F.2d at 1521.  The Court disposed of the argument, noting that the helmet requirement did not implicate the plaintiff alone, given that the required helmet and face shield may prevent a rider from becoming disabled by flying objects on the road, which might cause him to lose control and involve other vehicles in a serious accident. Id.  Further, a motorcyclist without a helmet is more likely to suffer serious head injury than one wearing the prescribed headgear. the injured cyclist may be hospitalized at public expense, and if permanently disabled, could require public assistance for many years.  Id. at 1522.  That being so, the helmet requirement was a rational exercise of the State's police powers.  Id.

In Hartog, the plaintiff argued that the mandatory seat belt law was invalid because the purpose of the provision was to protect the individual from his own folly and as such, had no

relation to public health, safety, or welfare.   See, 449 N.W. 2d at 856.  The Court turned down the

argument, observing that seat belt use enhances a driver's ability to maintain control of the car and

avoid injuries not only to the driver but to others.  Id. at 857.  Concomitantly, those accidents

impose direct and indirect costs on the public and third parties.  Id. at 858-859.  Thus, risk-taking

is not the driver's own business.  Id. at 859.  In the same manner, infection from COVID-19 and

its potential consequences are not a self-regarding activity without concern to anyone beyond the

individual inside it, for they may impose costs on other people, even the ultimate cost – life – plus

suffering and other costs.

Plaintiffs maintain that it does not make sense to ask the unvaccinated but not the

vaccinated to submit negative test results when the vaccinated can carry the same viral load if

infected (Docket No. 32, p. 14).  Dr. Cardona pointed out that the number of cases is higher among

unvaccinated people than among vaccinated people (Docket No. 71, p. 40).  Equally, the rate of

hospitalization is greater among the non-vaccinated than among the vaccinated.  Id. at 43.  Non-

vaccinated persons can spread the virus for a more extended period.  Id. at 46.  And even though a

vaccinated and an unvaccinated person can have the same viral load, the duration among the

vaccinated is much shorter.  Id. at 48.  The viral load goes down faster in vaccinated persons than

in ones that are not vaccinated.  Id. at 92.  As of August 2021, the CDC reported that "unvaccinated

individuals have a 6.1 greater risk of testing positive for COVID-19 and 11.3 times greater risk of

dying from COVID-19 than vaccinated individuals."  Bauer, 2021 WL 4900922 at *12.

Shaping the precise contours of public health measures "entails some difficult line-

drawing."  League of Independent Fitness Facilities and Trainers, Inc., 814 Fed. Appx. at * 129.

The demarcation must be upheld provided it does not categorize persons based on suspect or

suspect or quasi-suspect classifications and there is a rational basis for the difference in treatment.

Bauer, 2021 WL 4900922 at *12.  That is the situation here, for unvaccinated persons do not conform a suspect or quasi-suspect classification, and based on the record, there is a rational basis to treat unvaccinated persons differently than vaccinated individuals.  See, Valdez v. Grisham, --- F.Supp.3d----, 2021 WL 4145746, *9 (D.N.M. Sept. 13, 2021)(equal protection challenge based on difference in treatment between vaccinated and unvaccinated individuals not likely to succeed, as vaccination mandate did not target a suspect class or categorize persons based on quasi-suspect classifications, and the difference in treatment had a rational basis grounded in science and medicine); Bauer, 2021 WL 4900922 at *12 (same).

Plaintiffs adduce that to satisfy Due Process, "modern Supreme Court jurisprudence has required that the [G]overnment at the very least consider less intrusive alternatives" to vaccination (Docket No. 16, pp. 10-11).  EO 21-058 includes less restrictive alternatives to vaccination, by way of opt-outs and leaves of absence, and those alternatives comport with the level of scrutiny generally applicable to evaluate public-health measures under Jacobson, namely, rational-basis review.  See, Jones v. Cuomo, ---F.3d----, 2021 WL 2269551, *6 (S.D.N.Y. June 3, 2021) (observing that Jacobson "has been likened to rational basis review")(citing Roman Catholic Diocese of Brooklyn, 141 S.Ct. at 71 (Gorsuch, J. concurring) (pointing out that although Jacobson pre-dated the modern tiers of scrutiny, it "essentially applied rational basis review"); M. Rae, Inc. v. Wolf, 509 F.Supp.3d 235, 246 (M.D. Pa. 2020) (noting that Jacobson "is easily reconciled with the rational-basis standard of review")(citing Justice Gorsuch's concurrent opinion in Roman Catholic Diocese of Brooklyn, 141 S.Ct. at 71; Klaassen, 2021 WL 3073926 at *21 (explaining that Jacobson "effectively endorsed – as a considered precursor – rational basis review of a government's mandate during a health crisis"); Valdez, 2021 WL 4145746 at *6 (applying rational basis review in evaluating vaccination mandate); Bauer, 2021 WL 4900922 at *10-*11 (same).

Courts have relied on heightened or elevated tiers of review in cases involving fundamental rights.  Commenting on the subject, a sister court indicated in Does v. Mills, ---F.Supp.3d----, 2021 WL 4783626, *6 (D.Me. Oct. 13, 2021), aff'd 2021 WL 4860328 at *11, that applying rational basis review to the vaccine mandate at issue in Does would be in keeping with Jacobson, which the Court described as the Supreme Court's foundational decision in the area of mandatory vaccines, but that Jacobson did not specifically address the scope of an individual's constitutional rights under the First Amendment's Free Exercise Clause in relation to mandatory vaccines, the crux of the dispute therein.  In the same vein, in Tandon v. Newsom, ---U.S.----, 141 S.Ct. 1294 (2021)(per curiam), the Supreme Court applied strict scrutiny to grant an application for injunctive relief pending appeal in a case involving pandemic restrictions on private gatherings, as the State had treated some comparable secular activities more favorably than at-home religious exercises.

By contrast, plaintiffs do not assert claims under the Free Exercise Clause or other part of the First Amendment, and there is no fundamental right to refuse vaccination under the Due Process Clause.  See, Norris v. Stanley, 2021 WL 4738827, *2 (W.D.Mich. Oct. 8, 2021)(so holding); Bauer, 2021 WL 4900922 at *10-*11 (same).  Indeed, as recently as two weeks ago, the First Circuit rejected a free exercise and equal protection challenge to a vaccination mandate to healthcare workers, pointing out that given that the challenged rule was religiously neutral and generally applicable, it was not subject to strict scrutiny and "easily [satisfied] rational basis review." Does, 2021 WL 4860328 at *6-*7.[11]  So too with the vaccine mandate set in EO 21-058, which is a measure of general application and religiously neutral, with alternatives to vaccination through op-outs, one such alternative being testing without medical certificates or affidavits in lieu

---

[11] Also, it noted that even if strict scrutiny applied, "plaintiff still [had] no likelihood of success."  Does, 2021 WL 4860328 at *7.

of vaccination.  To qualify, the employee must provide at the beginning of each week a negative COVID-19 test result obtained during the previous 72 hours.  The opt-outs do not display an unconstitutional value judgment that gives preference to secular concerns over religious concerns.

Plaintiffs contend that they have a right not to be medically tested for a virus under the Due Process Clause (Docket No. 16, p. 12).  No such right exists under these circumstances.  See, Klaassen, 2021 WL 3073926 at *38 (declining plaintiffs' invitation to expand substantive due process rights to include the right not to be tested for a virus – COVID-19 – as that is not a right so deeply rooted in the Nation's history and tradition such as to be implicit in the concept of ordered liberty protected by the Due Process Clause).  And the testing alternative satisfies Jacobson.  It is directly related to EO 21-058's objective of containing the spread of the COVID-19 virus and its variants among the public to prevent escalation of the disease.  See, Little Rock Family Planning Services v. Rutledge, 458 F.Supp.3d 1065, 1074 (E.D. Ark. 2020) (recognizing connection between COVID-19 testing and limiting the spread of the virus); Wilcox v. Lancour, 2021 WL 230113, *8 (W.D.Mich. Jan.22, 2021) (acknowledging compelling governmental interest in testing inmates for presence of COVID-19 virus in order to control contagion and protect prisoners and staff).  It opens a reasonable path to avoid vaccination for employees who wish to pursue that course of action.  Given that it is focused on unvaccinated employees, who as mentioned earlier, bear a higher risk of contagion, it is not arbitrary and does not go beyond what is reasonably required for the safety of the public.  It is rationally related to a legitimate and compelling state interest, and directly promotes that interest.[12]

---

[12] The vast majority of hospitalizations and deaths caused by COVID-19 are in unvaccinated persons (Docket No. 51, ¶ 6).

Plaintiffs argue that the testing alternative is almost impossible to meet (Docket No. 16, p. 14). According to them, employees with modest government salaries must pay for medical referrals prior to taking a test, which entails spending approximately $200 per month, depending on the employees' health insurance coverage. Id. at 15. The Puerto Rico Department of Health, however, has fixed COVID-19 testing facilities ("fixed-points") throughout the Commonwealth, where individuals can get tested for COVID-19 free of charge. See, https://twitter.com/desaludpr (Including available locations). In addition, the Department of Health provides a free PCR-Molecular referral or equally valid antigen test to all citizens that desire to get tested for the virus (Docket No. 20, p. 26 n.5). Furthermore, the Secretary of Health issued an Administrative Order providing that medical referrals are not necessary for laboratories to administer the test. See, Secretary of Health's Executive Order 467 of October 19, 2020, available at https://www.salud.gov.pr/CMS/DOWNLOAD/3728 (last visited on October 27, 2021).[13] These actions create a framework to permit employees who opt for testing to do so without assuming the financial burden that plaintiffs have referred to.

Plaintiffs complain of the way that testing has been implemented. Plaintiff Zulay Rodríguez, who is expecting, testified that she has been tested 6 times, including before EO 21-058 (Docket No. 100, pp. 56-57). After EO 21-058 was adopted, she went during working hours to a Department of Health free-testing point in the town of Arecibo where she lives but was in her car waiting in line for 2 hours and a half. Id. at 45. She had to go to the bathroom, her husband,

---

[13] During closing argument, plaintiffs' counsel expressed that the medical referral waiver has not been in force or applied (Docket No. 116, p. 14). The court did not find any order repealing the waiver, and counsel did not mention one. As for application, there are no factual allegations or evidence that the Government of Puerto Rico is demanding medical referrals for COVID-19 testing. That referrals are taking place is not the Government's fault. If medical insurers are requesting those referrals in order to pay laboratories, nothing in the record shows that anybody has filed a complaint over this issue with the Secretary of Health or the Insurance Commissioner of Puerto Rico and that the Secretary and Commissioner have turned away from investigating or taking appropriate action.

who had been in the area for over 2 hours, went with her to speak to a security guard, and told the guard that his wife was pregnant, had been in line over 2 hours, and needed to go to the bathroom. Id. at 45.  The guard said he would help her.  Id.  Ms. Rodríguez used the bathroom and was able to get tested after a short line of maybe 2 people.  Id.  She asked if there was special treatment for pregnant women and the guard said no but that he would help her whenever she stopped by for testing.  Id.  Since then, Ms. Rodríguez goes to the gynecologist for follow up visits, and the doctor gives her medical orders for testing, free of charge.  Id. at 57.  She has not had to spend money on COVID-19 tests (id., p. 57), and has not been on unpaid leave in order to get tested (id. 59), but said that 2 hours and a half were deducted from vacation time when she went to the government testing site to be tested during working hours.  Id. at 44.

Usually, Ms. Rodríguez uses either Friday afternoons or Saturday mornings for testing because that is when she has time off, and she does not want to use up accrued leaves of absence (Docket No. 100, p. 43).  She must make arrangements for childcare because she is not taking her son with her to the testing site to avoid exposing him (id., p. 43), and on Saturday mornings she takes care of her mother, who is sick.  Id. at 43-44.  There is no indication that Ms. Rodríguez has ever asked the employer to modify her work schedule to accommodate her testing needs.  She works as a Clerk in the Department of the Family of Puerto Rico, earning $1, 341 per month.  Id. at 32.

Plaintiff Julissa Piñero has taken the test 4 times after EP 21-058 (Docket No. 100, p. 88). She has gone to Health Department fixed-points.  Id. at 82.  Once, she went to a testing site in the town of Juncos on her day off, woke up at 6:00 a.m. and arrived in Juncos by 7:30 a.m.  Testing started at 9:00 a.m. and she left at approximately 10:00 a.m.  Id.  Another day, she left work at 4:30 p.m. on a Friday, but when she arrived in Juncos was told the site had run out of tests.  Id. at 83.

She had the same problem with a testing site in the town of Humacao. Id. On a different occasion, she went to an alternate testing site in Humacao at approximately 7:30 a.m., and joined her husband, who had arrived earlier. Id. Testing started at around 9:00 a.m. and she left the site around 9:15 a.m. Id.

Ms. Piñero works close to the courthouse in Hato Rey, in San Juan, but has not sought or obtained information about free testing places in the area because her lunch hour is from 12m to 1:00 p.m., and does not think that she would make it back to work on time (Docket No. 100, pp. 86-87). She has not requested any modification to her work schedule to fit her testing needs. Id. at 87. She said that she suffers from sinusitis, not all nurses are the same, and during one test her nasal passages became irritated and bled (there were blood particles on the swab). Id. at 84. She did not seek medical attention because she did not think it was necessary to go to an emergency room for that problem. Id. at 88. She works as an Attendance Officer in the Human Resources Office of the Department of Public Security of Puerto Rico. Id. at 76. She is assigned to the Medical Emergencies Department, and nets $878.88 biweekly. Id. at 77.

Plaintiff Leila Ginorio testified that there have been highs and lows with testing, in the sense that some have been easy to obtain, and others have been problematic (Docket No. 104, p. 18). She said that in the week of August 16, 2021, she had to go to the doctor for a referral, and because the doctor had a lot of patients and she was afraid that she would not be in compliance with the negative test requirement by Tuesday, she had the test done privately for $45.00. Id. at 12-13. During the week of August 23, 2021, she went to the laboratory early at 6:30 a.m., had the test done, and went to work, arriving at 8:00 a.m. But time went by and she had not received the result. Id. at 19. She called the lab and was informed that it would take another extra 10 or 15 minutes. Id. But by 10:00 a.m. she still had not received the result. Id. As she wanted to be in

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 35

compliance with the Executive Order, she left work.  Id.  In the following weeks, she had the tests

done by way of $12.00 medical referrals or referrals obtained through Facebook for $3.00.  Id.

Ms. Ginorio asserted that her routine has changed in the sense that she has had to get up

earlier to be able to meet her work schedule (Docket No. 104, pp. 19-20).  So far, she has spent

$77.00, the equivalent of her weekly shopping trip for food, a cost to be added to the cost of the

mortgage, utilities, and phone.  Id. at 20.  Her initial test was on August 16, 2021, when the

Executive Order went into effect, but it was not until September 29, 2021 that her employer asked

her to submit evidence of testing.  Id. at 23-24.  She has had to use one day plus some hours from

vacation time to get tested.  Id. at 54-55.  She knows she can be tested on weekends.  Id. at 55.  On

Saturdays, she first attends her pro-life Ministry (described below), then goes shopping before

returning home to do laundry and clean the house.  Id. at 69.  On Sundays, she goes to church and

visits her parents.  Id.

Ms. Ginorio stated that she is aware she can get COVID-19 tests without a medical referral

(Docket No. 104, p. 53).  As well, she knows there are fixed-points from the Health Department

that provide free testing.  Id. She has not done research on where those points are located.  Id.  She

has seen the one in the area where she lives, and the lines of people waiting, which her brothers

from Church tell her are due to the COVID-19 tests.  Id.  She expressed that she is not against

going to a fixed-point. However, because of her severe allergies, sinusitis and rhinitis, and her last

experience while taking a PCR test, she found it extremely uncomfortable and had allergies during

the day.  Id. at 54, 67.  She indicated that the points only use the PCR test.  Id. at 67.  The private

tests she gets are blood tests.  Id. at 68.  She works as a Ruling Official in the Unemployment

Service of the Department of Labor and Human Resources of Puerto Rico (id., p. 4), and after

deductions receives $1,600.00 per month.  Id. at 7.

Plaintiff Yohama González testified that the first time she took the test she paid $15.00 for a referral plus $15.00 for each of her 2 children, who are college students (Docket No. 104, pp. 91, 93).  Since then, the doctor has charged her $30.00 for the 3 referrals ($10.00 per referral).  Id. at 92.  She expressed that $10.00 per week is the equivalent of her phone service, which she needs for work.  Id. at 93.  With testing, her routine has changed, as she has to take the test on Fridays, Saturdays or Sundays, which limits time with her family.  Id. at 96. She does not go to the fixed-points because it would take more time away from her mother and uncle, who is 78 years of age. Id. at 94.  She finds testing in a private laboratory more convenient.  Id. at 103.  She prefers the antigen test because she suffers from nasal congestion and this test is less invasive than the PCR test, which according to her is the one used in the fixed-points.  Id. at 96.  Sometimes, to take the test she goes a little bit outside of her work route and notifies her supervisor, who has not raised any objections.  Id. at 101.  On one occasion she was unable to submit the test on a Monday and submitted it on Tuesday.  Id.  She works as an inspector supervisor in the Gambling Division of the Puerto Rico Gaming Commission (id., at pp. 76, 116), and has a monthly gross salary of $2,760.00.  Id. at 93.

From this perspective, plaintiffs argue that there must be narrow tailoring with less onerous means to obtain the desired result such as requiring the Government to allow employees to work remotely, to administer COVID-19 tests for the employees at the workplace; to enlarge the timeframe that employees have to take the test each week; and to provide paid leave and reimbursement of expenses incurred by employees who take the tests in private laboratories (Docket No. 11, ¶ 133; Docket No. 16, pp. 2, 17).[14]  The court sympathizes with plaintiffs.

---

[14] As part of their closing argument, plaintiffs also stated that the Government has not authorized home-testing kits for this purpose (Docket No. 116, pp. 7-8).  For context, Abbott received the FDA EUA for the over-the-counter use of its "BinaxNOW™ COVID-19 Ag Self-Test for detection of COVID-19 infection.  This allows individuals with or

However, it cannot conclude that the existing testing alternative to vaccination does not satisfy the Due Process Clause.

Narrow tailoring "is a creature of strict scrutiny, not rational basis review." Holt v. Howard, 2014 WL 3778345, *2 (E.D. Ark. July 29, 2014). As discussed, the prerogative to refuse COVID-19 testing does not rise to the category of a fundamental right – Klaassen, 2021 WL 3073926 at *38 (there is no substantive due process right not to be tested for COVID-19) – and people have no fundamental right "to dictate the location and provider of a given medical procedure" either. Birchansky v. Clabaugh, 955 F.3d 751, 756 (8th Cir. 2020). That being the case, the testing measures that have been put in place do not call for narrow tailoring. The degree of review to which they are subject is deferential. For that reason, the burden is on the complainant to show that the governmental act complained of does not further a legitimate state purpose by rational means. Bauer, 2021 WL 4900922 at *10 (articulating formulation). It is enough that there is an

---

without symptoms to have access to this test without a prescription. As described in the Instructions for use, the test is "a lateral flow immunoassay intended for the qualitative detection of nucleocapsid protein antigen from SARS-CoV-2." The test is authorized for home use with self-collected observed direct anterior nasal (nares) swab samples from individuals aged 15 years or older or adult collected nasal swab samples from individuals aged 2 years or older with or without symptoms or other epidemiological reasons to suspect COVID-19 infection, when tested twice over three days with at least 36 hours between tests." See, "Instructions for Use Home Test," available at https://www.fda.gov/media/147255/download and https://abbott.mediaroom.com/2021-03-31-Abbotts-BinaxNOW-TM-Rapid-Antigen-Self-Test-Receives-FDA-Emergency-Use-Authorization-for-Asymptomatic-Over-the-Counter-Non-Prescription-Multi-Test-Use. To perform the test, a nasal swab specimen is collected from the patient, by swabbing both nostrils for about 15 seconds each. Six drops of extraction reagent from a dropper bottle are added to the top hole of the swab well. The patient sample is inserted into the test card through the bottom hole of the swab well, and firmly pushed upwards until the swab tip is visible through the top hole. The swab is rotated 3 times clockwise and the card is closed, bringing the extracted sample into contact with the test strip. Test results are interpreted visually at 15 minutes based on the presence or absence of visually detectable pink/purple-colored lines. Results should not be read after 30 minutes. A second test should be taken at least 36 hours after the first test. Individuals should report their test result through the NAVICA app and provide all results obtained with this product to their healthcare provider in order to receive appropriate medical care. Each box comes with 2 test cards, 2 nasal swabs, 2 reagent bottles, 1 patient instructions and 1 fact sheet for individuals. Detailed instructions are available at https://www.fda.gov/media/147255/download. All sites were last visited on October 28, 2021. According to Juan Carlos Fenollal (one of plaintiffs' witnesses), each testing kit costs $20.00 plus taxes (Docket No. 76, p. 14).

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 38

evil at hand for correction, and that it might be thought that the particular measure was a rational way to correct it.  Id.

   Plaintiffs have not shown that the testing alternative fails to pass muster under this standard. Based on the previous discussion, that alternative is a rational way to correct an evil, even if it might not be "perfectly tailored to that end."  Box v. Planned Parenthood of Indiana and Kentucky, Inc., ---U.S.----, 139 S.Ct. 1780, 1782 (2019).  Policymakers are "allowed leeway to approach a perceived problem incrementally."  F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 316 (1993).  The Governor's order "need not be the most effective or least restrictive measure possible" to deal with the problem at hand.  League of Independent Fitness Facilities and Trainers, Inc. v. Whitmer, 814 Fed.Appx. 125, 129 (6th Cir. 2020).

   Viewing plaintiffs' testimonies from a different analytical angle confirms the absence of unconstitutional deficiencies in testing implementation.  Plaintiffs stated that to comply with the testing requirement, they have had to change their routine, use free time, wake up earlier, obtain medical referrals and/or wait in line for significant amounts of time.  True enough.[15]  What they experienced is inconvenient and irritating but does not suffice to make the testing requirement unreasonable in a constitutional sense.  The dividing line may be distilled from various courts' treatment of what constitutes a substantial or undue burden in different contexts, albeit not involving the same rights as have been invoked here.  For example, in Planned Parenthood v. Casey, 505 U.S. 833, (1992), the Supreme Court addressed regulations relating to pre-viability abortions, noting that:

>  Numerous forms of state regulation might have the incidental effect
>  of increasing the cost or decreasing the availability of medical care,

---

[15] Plaintiffs' witnesses presented variations of the same theme.  Because the constitutional inquiry in an as-applied challenge "is limited to the plaintiffs' particular situation," Women's Medical Professional Corp. v. Voinovich, 130 F.3d 187, 193 (6th Cir. 1997), the court has focused on each of the plaintiffs' individual case.

<u>Rodriguez Vélez et al.</u> v. <u>Pierluisi-Urrutia</u>
Civil No. 21-1366 (PAD)
Opinion and Order
Page 39

> whether for abortion or any other medical procedure.  The fact that
> a law which serves a valid purpose, one not designed to strike at the
> right itself, has the incidental effect of making it more difficult or
> more expensive to procure an abortion cannot be enough to
> invalidate it.  Only where the state regulation imposes an undue
> burden on a woman's ability to make this decision does the power
> of the State reach into the heart of the liberty protected by the Due
> Process Clause.

<u>Casey</u>, 505 U.S. at 874.  Along this line, regulations may not impose a substantial obstacle to the woman's exercise of the right to choose.  <u>Id.</u> at 877.  The Court found such an obstacle in <u>FemHealth USA, Inc.</u> v. <u>City of Mount Juliet</u>, 458 F.Supp. 3d 777 (M.D. Tenn. 2020).  In that case, an ordinance prevented a nonprofit entity from performing surgical abortions at its current location.  <u>Id.</u> at 797.  Applying the undue burden framework, the Court expressed that there was no evidence showing the relationship between the purported benefit to the state and the ordinance.  Further, relocating the facility would be cost prohibitive considering that in alternate areas, plots of land had to be developed and a clinic built from the ground-up; lacked medical office facilities where the entity could relocate to, and even if space had been available, it would have had to be retrofitted to carry out surgical procedures; and the entity had already incurred in significant expenses, including promotional expenditures, to develop its existing location and had several years remaining on its lease.  <u>Id.</u> at 797, 801-803.  Without the facility, women seeking the entity's services would have to travel hundreds of miles round-trip to access the same services elsewhere; delay care for weeks; or forego a surgical abortion altogether.  <u>Id.</u> at 799-800.

The Court reached the opposite conclusion in <u>Women's Medical Professional Corp</u>. v. <u>Baird</u>, 438 F.3d 595 (6th Cir. 2006).  There, the state department of health issued an order requiring an ambulatory abortion clinic to close immediately for failure to enter into a written transfer agreement with an area hospital.  <u>Id.</u> at 598.  The agreement ensured that the ambulatory facility

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 40

could transfer patients in the event of medical complications, emergency situations, and other needs.  Id. 599.  The Court concluded that the closing would not pose an undue burden because potential patients could obtain an abortion approximately 45 to 55 miles from the clinic.  Id. at 605.  See also, Casey, 505 U.S. at 886-887 (24-hour waiting period not a substantial burden).

Shifting lenses, in Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214 (11th Cir. 2004), the Court held that requiring congregations to relocate did not impose a substantial burden on them even though it would require congregants to walk farther, burdening those who were ill, younger or very old, and occasioning them to stop attending weekly services altogether. Walking a few extra blocks, even considering the heat and humidity of the area, was not unduly burdensome under the Religious Land Use and Institutionalized Persons Act.  Id. at 1227-1228.  In Storm v. Town of Woodstock, N.Y., 944 F.Supp. 139 (N.D.N.Y. 1996), the Court concluded that a town resolution prohibiting parking on a road to a meadow where a religious ceremony was held did not substantially burden plaintiffs' religious observance under RFRA, even though the regulation made access to the meadow less convenient for plaintiffs on full moon evenings, forcing them to park at least half a mile from the entrance to the area and walk the distance along the road, at night.  Id. at 141-142, 146.

With this backdrop, as applied to plaintiffs, the EO 21-058 testing requirement does not impose unreasonable burdens on them.  Instead of closing testing facilities, the Government has opened or authorized free-of-charge testing sites.  Plaintiffs have been able to use laboratories to comply with the requirement.  The personal adjustments and inconvenience they described do not cross the threshold of invalidity.  The incidental effect that a measure has of making a medical procedure more difficult or expensive to procure is not enough to invalidate it.  And here the Government has sought to facilitate, albeit with some imperfections, compliance with the

requirement instead of imposing substantial or undue obstacles in the path of those interested in achieving that goal.  Perfection is not the yardstick by which to measure adherence to the Due Process Clause.  See, Slidewaters LLC v. Washington State Department of Labor, 4 F. 4th 747, 758-759 (9th Cir. 2021(applying formulation in affirming dismissal of complaint arising from measures taken as a result of COVID-19); Big Tyme Investments, LLC, 985 F. 3d at 479 (same in affirming denial of preliminary injunction in context of equal protection challenge to COVID-19 executive order).[16]

Similarly, EO 21-058 does not force government employees to take any test.  If they decide not to, EO 21-058 permits them to take leaves of absence – paid and unpaid.  This may call for a trade-off.  Nonetheless, trade-offs are not improper in this realm.  To illustrate, in Hassan v. Wright, 45 F.3d 1063 (7th Cir. 1995), the Court rejected a substantive due process challenge to a statute, Aid to Families with Dependent Children, which prevented recipients from collecting child-support directly from non-custodial parents, instead providing those recipients with the first $50.00 of any child support that the state collected on their behalf.  Id. at 1069-1070.  The Court noted that the statutory benefits may not meet the recipients' standards of need, but that did not render the benefits meaningless alternatives.  Plaintiffs received some level of benefits.  Id. at 1079.  It was up to them to make the rational choice to accept the trade-off.  Id.  Similarly, in Harsman v. Cincinnati Children's Hospital Medical Center, 2021 WL 4504245, *1 (S.D. Ohio Sept. 30, 2021),

---

[16] Plaintiffs state that Puerto Rico performs 75% less COVID-19 testing per 100,000 people than the average total of tests in the mainland and ranks second to last (ahead only of the U.S. Virgin Islands) in total tests performed per 100,000 people among U.S. jurisdictions (Docket No. 11, p. 7), and argue that Puerto Rico is using its own lack of institutional capacity to justify imposing severe burdens on individuals.  Id. at pp. 7-8. The allegation attempts to link a statistic with an intent to reach a goal, e.g. "to justify imposing severe burdens on individuals."  There are no factual allegations or evidence to sustain the theory that such was the Governor's intent in signing EO 21-058.  Moreover, Dr. Cardona expressed that even though the availability of tests has varied, tests are available and there is no scarcity at this time (Docket No. 71, p. 76).  In the end, though, plaintiffs' argument does not detract from the analysis in the text.

the Court denied a request for an order restraining defendants from implementing a vaccine mandate with medical and religious exemptions, noting, among other things, that no plaintiff was being vaccinated against his or her will but rather, were choosing between complying with a condition of employment or dealing with the potential consequences of that choice.  Id. at *4.

Plaintiffs fault EO 21-058 for being indefinite, that is, for not having an expiration date (Docket No. 42, p. 8).  Without more, this might be problematic.  In context, however, it does not blemish the legality of the mandate.  The Executive Order states it shall remain in effect until the emergency declared in EO 20-020 is rendered ineffective, or until the Order is amended or repealed by a subsequent executive order of by operation of law (Docket No. 11-1, Section 11, p. 13).  Dr. Cardona explained that the mandate may be reviewed although from her standpoint, it is justified until the parameters that are being monitored show that the disease is under control (Docket No. 106, pp. 6-7, 14).  Put differently, there is monitoring, and governmental action in response, a fact confirmed with review of the Governor's executive orders.

Take EO 20-023 (March 15, 2020), which decreed an Island-wide lockdown except in case of essential business and services, which were also nonetheless subject to restrictions and a curfew. That situation changed with EO 20-033 (April 12, 2020), which in light of the success achieved in flattening the virus' curve of infection, eased limitations on certain industrial, commercial and corporate operations, and on the movement of motor vehicles, a fact acknowledged in EO 20-038, p. 3 (May 20, 2021), and in EO 20-041 (May 21, 2020), which continued a gradual reopening of various sectors of the economy.  In the same way, after issuing EO 21-058, the Governor issued EO 21-070 (September 20, 2021), where, alluding in part to EO 21-058, he recognized that vaccination and other measures resulted in a decrease of relevant numbers in the statistics.  Id. at

1.  Furthermore, he expressed that the analysis and study of results will continue in order to adopt any necessary modifications.  Id. at 3.

        This is an important element, because "[as] our country and communities progress through a pandemic, the government must continually update its practices in light of the most recent medical and scientific developments."  Klaassen, 2021 WL 3073926 at *31-*32.  A law or policy should be written with a mindset that medicine and science, and the circumstances that they create, will evolve, and so must the law or policy evolve or be revisited in amendment.  Id. at 32.  The record shows that in the case of EO 21-058, the Governor is conscious of, and has acted within these parameters.

        In sum, the court finds no invasion of fundamental constitutional rights rather than a reasonable exercise of governmental prerogatives in response to a public health crisis.  Everything considered, the vaccination mandate together with the opt-outs, testing and availability of leaves of absence reflects a legitimate exercise of Puerto Rico's police powers and does not infringe upon the substantive component of the Due Process Clause.  See, Bauer, 2021 WL 4900922 at *1, *20 (denying preliminary injunction in case of vaccine mandate with exemptions based on medical need or religious objection, including temporary deferral of mandate for any employee on extended leave of absence).[17]

### ii.  **Procedural Due Process**

        Plaintiffs allege EO 21-058 deprived them of procedural due process (Docket No. 11, p. 40; Docket No. 16, p. 18).  A procedural due process claim has two distinct elements: (1) a constitutionally protected interest; and (2) deprivation of that interest without adequate procedural

---

[17] In light of this conclusion, the court has no occasion to examine whether the mandate would be valid without religious or personal-preference exemptions- it has a medical exemption -or the compensatory time-leave of absence alternative to testing.

protections under color of state law.  See, García-González v. Puig-Morales, 761 F.3d 81, 88 (1st

Cir. 2014).  Once it is determined that the Due Process Clause applies, the question is "what process

is due."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985).  In that posture, the

deprivation by state action of a constitutionally protected interest "is not in itself unconstitutional."

Murphy v. Rychlowski, 169 F.Supp.3d 911, 915 (W.D. Wis. 2016).  What is unconstitutional is the

deprivation of such an interest without satisfactory procedural safeguards.  Id.

Plaintiffs argue that as public career employees they have a protected interest in continued

employment (the court agrees), and the vaccine mandate effectively removed them of that interest

(Docket No. 16, p. 18).  To the extent plaintiffs do not vaccinate or select one of the opt-outs and

submit weekly negative COVID-19 tests, they would not qualify for in-person work.  But they

could use paid leaves of absence.  And if those leaves have been depleted, they may request an

unpaid leave.  Therefore, EO 21-058 does not sever plaintiffs' relationship with the Government

so as to deprive them of continued employment in need of procedural due process protection.  See,

Little v. Mizell, 2016 WL 4384674, *2 (E.D. La. Aug. 17, 2016)(in absence of termination, plaintiff

was not entitled to pre-deprivation procedures that would have applied if he had been terminated).

Plaintiffs assert that they were offered no hearing or due process to argue that the

Government should take more narrowly-tailored approaches as an alternative to going without

vaccination (Docket No. 16, pp. 19-20).  EO 21-058 applied prospectively on a class-wide basis

to all government employees.  Hence, any change it may have brought about in the employment

regime is quasi-legislative rather than adjudicative.  The distinction is critical, to plaintiffs'

detriment.  When property is affected by generally-applicable legislative action, property owners

are not entitled to notice above and beyond the notice provided by the enactment and publication

of the statute.  See, United States v. Locke, 471 U.S. 84, 108 (1985)(addressing issue).  In those

circumstances, "the legislative determination provides all the process that is due."  Hoffman, 909

F.2d at 619-620 (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982)).[18]  So too

with administrative decisions of a legislative or general rulemaking character.  See, Air Line Pilots

Ass'n, Intern. v. Quesada, 276 F.2d 892, 894, 896 (2d Cir. 1960), *cert. denied* 366 U.S. 962

(1961)(rejecting argument that because regulation forbidding air carriers from utilizing pilots

beyond the age of 60 was promulgated without the holding of adjudicatory hearings it was

constitutionally defective, given that the regulation consisted of rule-making, not of

adjudication).[19]

     For the same reason, to the extent plaintiffs complain that they were entitled to receive an

individualized notice or some kind of individualized hearing before EO 21-058 was adopted or

implemented, the law is not on their side.   See, Harris, 2021 WL 3848012 at *5 (rejecting

---

[18] This is so even when the legislature enacts general legislation eliminating statutory rights or otherwise adjusting the benefits and burdens of economic life.  See, Hoffman, 909 F.2d at 619-620 (acknowledging principle).  See also, Smith v. Jefferson County Bd. of School Com'rs, 641 F.3d 197, 217 (6th Cir. 2011)("The Board's decision to abolish the alternative school […] to save money was the result of weighing budgetary priorities, a legislative activity.  Thus, because the Board was engaged in a legislative activity, there was no requirement that the teachers be given notice or an opportunity to be heard prior to the Board's decision to abolish the alternative schools.  In such circumstances, the legislative process provides all the process that is constitutionally due when a plaintiff's alleged injury results from a legislative act of general applicability")(internal citations omitted); Gattis v. Gravett, 806 F.2d 778, 779, 781 (8th Cir. 1986)(while the legislative withdrawal from the definition of "personnel" covered by the civil service provisions, "those persons holding the rank of major and above," among others, in the office of the county sheriff of any county with a civil service system, may be a deprivation, the legislative process itself provided citizens with all of the process that they were due); Richard J. Pierce, Jr., *Administrative Law Treatise*, § 9.2, p. 561 (Aspen 4th Ed.) ("Procedural due process does not apply when government makes a policy decision that has an adverse impact on an entire classification of individuals or firms … even if that decision has the same effect on the interests of the members of the group as would an individualized deprivation.  The distinction between individualized deprivations, that are protected by due process, and policy-based deprivations of the interests of a class, that are not protected by procedural due process, is central to an understanding of the U.S. legal system").

[19] See also, U.S. v. Florida East Coast Ry. Co., 410 U.S. 224, 245 (1973)(…"[Supreme Court] decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other"); Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 142, 144-145 (2d Cir. 1994)(rejecting argument that a New York board's policy statement which had the effect of discouraging shippers from using the services of Connecticut pilots deprived the Connecticut pilots of property without procedural due process of law, as the statement "was essentially legislative rather than adjudicative" … "[o]fficial action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause" … and "[t]hese constitutional due process requirements apply only where the official action is designed to adjudicate disputed facts in particular cases")(internal citations omitted).

procedural due process claim given that mandatory vaccination policy was generally applicable to all students and formulated prospectively); Valdez, 2021 WL 4145746 at *9 (reasoning that because public health order at issue was generally applicable to all congregate care facility workers, state fair attendees and governor's office staff, the plaintiffs were not entitled to process above and beyond the notice provided by the enactment and publication of the order).

Plaintiffs contend that they should be provided with due process to determine whether they could satisfy the employment duties working remotely (Docket No. 11, ¶ 32). The Government of Puerto Rico Remote Work Act, Law No. 36 of April 9, 2020, permits public agencies and public corporations to provide employees with the alternative of remote work provided they meet certain criteria. As described in the motion to dismiss, upon request, the covered entity evaluates the employee's eligibility based on her position and essential duties (Docket No. 40. p. 27). The entity has discretion to grant or deny the employee's request. Id. The Governor posits, and plaintiffs do not challenge, that adverse decisions may be brought to the Puerto Rico Public Service Commission, a quasi-judicial body entrusted with resolving government employment disputes (Docket No. 40, p. 9).

The Public Service Commission's decisions are reviewed in the Puerto Rico Court of Appeals. See, P.R. Laws Ann. tit. 3A, App. XIII, Art. 14. Courts generally "do not consider pre-deprivation and post-deprivation procedures in isolation." Duhani v. Town of Grafton, 52 F. Supp. 3d 176, 182 (D. Mass. 2014). Instead, they review the process in totality. Id. And although there are no allegations or evidence of grievances for denials of requests for remote work in the instant case, these review mechanisms satisfy the procedural component of the Due Process Clause. See, SH3 Health Consulting, LLC v. Page, 459 F.Supp.3d 1212, 1226 (E.D.Mo. 2020)(no procedural due process violation when state allows person to challenge administrative decision in court).

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 47

### iii.  **RFRA**

Plaintiffs contend that the vaccine mandate violates RFRA (Docket No. 11, p. 54; Docket No. 16, p. 20).  The statute offers very broad protection for religious liberty by exempting religious believers from laws that substantially burden the exercise of their religious beliefs.  See, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 693 (2014)(describing statute).  A plaintiff alleging a RFRA claim has "the initial burden of establishing a prima facie case by showing that the application of the challenged law substantially burdens a sincere religious exercise." Perrier-Bilbo v. United States, 954 F.3d 413, 431 (1st Ci0r. 2020).[20]  If the claimant establishes a prima facie case, the burden shifts to the government to show that its actions were ". . .the least restrictive means of furthering a compelling governmental interest."  United States v. Quaintance, 608 F.3d 717, 719-720 (10th Cir. 2010).

Congress enacted RFRA in 1993 in response to Employment Div. Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), which held that under the Free Exercise Clause of the First Amendment, neutral, generally-applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.  See, Hobby Lobby, 573 U.S. at 693-695 (explaining RFRA's background).  Originally, the statute applied to the Federal Government and the States and their departments, agencies, instrumentalities and officials. See, Pub. Law 103-141, 107 Stat. 1488 (Nov. 16, 1993), Sec. 5 (defining "government" under

---

[20] The sincere belief requirement has its roots in a long tradition of exempting conscientious objectors from conscripted military service.  See, Ben Adams and Cynthia Barmore, *Questioning Sincerity: The Role of the Courts after Hobby Lobby*, 67 Stan. L. Rev. Online 59, 60 (2014).  That policy created a strong incentive to feign religious sincerity- and forced draft boards and courts to conduct rigorous inquiries from religious claims.  Id.  In Witmer v. United States, 348 U.S. 375 (1955), the Supreme Court observed that the ultimate question in such cases is the sincerity of the registrant objecting to military service.  Id. at 381.  While the truth of a belief is not open to question, there remains the significant question whether "it is truly held."  United States v. Seeger, 380 U.S. 163, 185 (1965).  Since then, "courts have [examined] religious sincerity in a variety of contexts," including in criminal cases.  See, Adams and Barmore, supra at 61.

RFRA to include States and their subdivisions).  The definition of "State" included the District of Columbia, the Commonwealth of Puerto Rico and territories and possessions of the United States. Id.

In enacting the most far-reaching and substantial of RFRA's provisions, those which impose its requirements on the States, Congress relied on its enforcement power under Section 5 of the Fourteenth Amendment.  See, City of Boerne v. P.F. Flores, 521 U.S. 507, 516-517 (1997) (so noting)(citing "Religious Freedom Restoration Act of 1993," S. Rep. No. 103-111, pp. 13-13 (1993)(Senate Report); H.R. Rep. No. 103-88, p. 9 (1993)(House Report).   In City of Boerne, however, the Supreme Court held that Congress had overstepped its Section 5 authority.  See, 521 U.S. at 511, 536.  The Court found that RFRA's effect on state laws was too broad to be construed as a remedial measure for violations of free exercise, and instead could only be read as an attempt to redefine and expand the constitutional protection of free exercise.  Id. at 532.

In 2000, Congress deleted from the RFRA the term "State," replaced it with the term "covered entity," and within that term included the District of Columbia as well as the Commonwealth of Puerto Rico and all territories and possessions of the United States.  See, Pub. Law 106-274, 114 Stat. 803, Sec. 7 ("Amendments to Religious Freedom Restoration Act"), codified at 42 U.S.C.  2000bb-2(2).  Congress' intent to apply the RFRA to Puerto Rico and other territories would appear certain on the face of the law.  So, in Cutter v. Wilkinson, 544 U.S. 709 (2005), the Supreme Court acknowledged that Courts of Appeals have held that RFRA "remains operative as to the Federal Government and federal territories and possessions."  Id. at 715 n.2. And this includes Puerto Rico.  See, Franklin California Tax-Free Trust v. Puerto Rico, 805 F.3d 322, 344 (1st Cir. 2015)("Puerto Rico is constitutionally a territory" of the United States)(internal

quotations omitted), *aff'd* 136 S.Ct. 1938, 1949 (2016).[21]   On this understanding, the court

concludes that the RFRA applies to Puerto Rico as a covered entity of the United States.[22]   But the

conclusion does not lead to a remedy such as plaintiffs have argued for.

   The RFRA defines "religious exercise" to include "any exercise of religion, whether or not

compelled by, or central to, a system of religious belief."  Kaemmerling v. Lappin, 553 F.3d 669,

678 (D.C.Cir. 2008)(citing 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)).   A religious exercise

implicates "'not only belief and profession but the performance of (or abstention from) physical

acts' that are 'engaged in for religious reasons.'"  Burwell v. Hobby Lobby Stores, Inc., 573 U.S.

682, 710 (2014)).  Successively, a substantial burden exists when the Government forces a person

to act, or refrain from acting, in violation of his or her sincere religious beliefs, by threatening

sanctions, punishment, or denial of an important benefit as a consequence for noncompliance.  See,

Thomas v. Review Bd. of Indiana Employment Sec. Division, 450 U.S. 707, 717-718

(1981)(discussing concept); United States v. Sterling, 75 M.J. 407, 417 (C.A.A.F. 2016) (similar).

   The determination of what is a religious belief or practice "is more often than not a difficult

and delicate task."  Thomas, 450 U.S. at 714.  The resolution of that question does not turn upon a

judicial perception of the particular belief or practice in question.  Id.  Religious beliefs need not

be acceptable, logical or comprehensible to others in order to merit protection.  Id.  Turning to

plaintiffs, Ms. González testified that vaccination is against her religious convictions, which are

---

[21] As a territorial entity, Puerto Rico nevertheless boasts "a relationship to the United States that has no parallel in … [United States'] history."  Puerto Rico v. Sánchez-Valle, 136 S.Ct. 1863, 1876 (2016).

[22] On this topic, *Cf.* Comité Fiestas de la Calle San Sebastian, Inc., v. Cruz, 207 F.Supp.3d 129, 144 n.8 (D.P.R. 2016)(RFRA applies to actions by the Commonwealth of Puerto Rico as a covered entity of the United States) and Guam v. Guerrero, 290 F.3d 1210, 1221-1222 (9th Cir. 2002)(RFRA applies to Guam) *with* People v. Felix, 2018 WL 4469867, *3 (V.I. Super. Sept. 11, 2018)(finding unnecessary to decide whether RFRA applies to the U.S. Virgin Islands).

<u>Rodríguez Vélez et al.</u> v. <u>Pierluisi-Urrutia</u>
Civil No. 21-1366 (PAD)
Opinion and Order
Page 50

based on several Biblical postulates (Docket No. 104, p. 77).  She expressed that the Lord made us superior to beasts, creating us in His image and likeness, and we have to take care of our bodies because they are the Temple of the Holy Spirit.  <u>Id.</u>  She indicated that such care should be done through the most natural means possible because science can be used for good and for evil, and that has been the case since the beginning of Genesis.  <u>Id.</u>  She pointed out that she takes care of her health by keeping a healthy body, following the methods of eating that are prescribed in the Books of Leviticus and Deuteronomy and that is why she promotes natural medicine as much as she can.  <u>Id.</u>

Ms. González stated that children should not be sacrificed for the benefit of adults because it would be akin to the ritual of idolatry to Moloch described in the Old Testament (Docket No. 104, p. 77).  She explained that Moloch is a pagan god, the god for rituals of fertility, to which women surrendered their children for sacrifices, and the vaccine takes advantage of the death of innocent children even though God says in the Bible that the blood of the innocent will be claimed.  <u>Id.</u> at 79.  She pointed out that she learned through Christian platforms of the use of fetal cells in the creation of the vaccine.  <u>Id.</u>  She mentioned the Pope said that even though abortion cells had been used to create the vaccine, people would not commit any evil by inoculating.  <u>Id.</u>  She added that she heard a Cardinal or a Bishop by the name of Vigano, state that this is a sacrilege, and that the Pope is taking an antichrist attitude, and so, she does not want to be involved with a vaccine created with abortion cells.  <u>Id.</u> at 79-80.

Ms. González mentioned that the Book of Apocalypse indicates that the mark of the beast will be imposed on all humanity (Docket No. 104, pp. 77-78).  She remarked that because of this mark, citizens will not be able to buy or sell, unless they have the mark and only those who have the mark will be considered citizens with full rights.  <u>Id.</u> at 78.  She explained that when the

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 51

Governor of Puerto Rico announced the vaccination mandate, he said that he was closing the circle. Id.  For Ms. González, the specific characteristics in the Book of Apocalypse were being met.  Id. And it made her reaffirm herself not to take on that mark.  Id. at 78-79.

Ms. Ginorio testified that she belongs to the Disciples of Christ Church (Docket No. 104, p. 9).  She is pro-life and works every Saturday from 7:00 or 7:30 in the morning until 11:30 in the morning with the ministry of Defenders of the Sidewalk, going to the front of a Family Planning Clinic, an abortion clinic, in Bayamón, Puerto Rico, to bring to the women who go to the clinic a message of love, peace and hope with alternatives to abortion.  Id. at 9-10.  She expressed that she saw a book in a supermarket called "Prayer Warrior" and purchased it because she needed to strengthen her prayer relationship with the Lord.  Id. at 12.

Ms. Ginorio said that in the first chapter, the author urges Christians to pray for a specific topic, and that the correct way to do this is to ask the Lord for guidance (Docket No. 104, p. 12). She indicated that at that moment, she set the book aside and said, "Well Lord, I need you to tell me what Cause you want me to pray for," and she heard His voice saying "abortion."  Id.  Ms. Ginorio expressed that forcing her to get vaccinated represents a betrayal of the Lord, who changed her life, as Pfizer and Moderna used cell lines of aborted babies to create the vaccine and Johnson & Johnson used cell lines of babies in the design, development and production of the vaccine.  Id. at 11-12, 51.

Finally, Ms. Piñero testified that she has not been vaccinated because of religious beliefs (Docket No. 100, p. 78).  She indicated that the Bible is the basis of her faith, and it instructs her that her body is a temple of the Holy Spirit such that she should not accept anything that could harm her body, including the vaccine.  Id.

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 52

From these testimonies, the court construes the refusal of Ms. González, Ms. Ginorio and Ms. Piñero to vaccinate as religious exercises based on sincerely held religious beliefs.[23] EO 21-058 does not, however, force them to vaccinate.  Nevertheless, they contend that EO 21-058 requires a qualifying affidavit only if the employee invokes a religious belief, not in other instances, which they view as discriminatory; and question that to qualify for the religious exemption, the affidavit requires the signature of a spiritual leader, which they object to, because for them, religious beliefs cannot be conditioned on a third-party's imprimatur (Docket No. 16, pp. 20-24).

Section 2 of EO 21-058 exempts from the vaccination mandate employees whose immune system is compromised, are allergic to vaccines, or have a medical contraindication to the receipt of a vaccine and those whose refusal to be vaccinated is premised on religious beliefs, provided that the vaccines are against the employee's religious observance.  For employees in the medical category, EO 21-058 requires them to submit a certification from a physician authorized to practice in Puerto Rico.  Id.  For employees in the religious exemption category, EO 21-058 requires them to furnish an affidavit of religious objection whereby the employee, together with the minister or spiritual leader of her church or religion, state under oath and penalty of perjury that the employee cannot receive a COVID-19 vaccine on the basis of her religious beliefs.  Id.

---

[23] Contrary to the other plaintiffs, Ms. Rodríguez testified that she decided not to vaccinate because of her pregnancy and safety of her baby (Docket No. 100, pp. 34, 37, 55), for she considers the vaccine too experimental and does not trust it.  Id. at 55.  Further, she believes that as an individual, she has the freedom of not consenting to being administered medical treatment.  Id. at 38.  These are not religiously motivated grounds to oppose vaccination and, thus, do not sustain a claim under RFRA.  As then Judge, now Justice Kavanaugh observed in Priests for Life v. U.S. Dept. of Health and Human Services, 808 F.3d 1 (D.C. Cir. 2015), "RFRA does not provide protection to philosophical, policy, political, or personal beliefs."  Id. at 17, n.4 (dissenting from denial of rehearing en banc); Cavizel, 701 F.Supp.2d at 428 (explaining in context of school mandatory vaccination requirement with religious exception, that the exception was restricted to persons whose opposition stemmed from "religious" belief, not "views founded upon medical, personal, philosophical or even moral considerations").

Plaintiffs' impression that an affidavit is only required for the religious objection is accurate, insofar as with respect to the medical exception, no affidavit is required but a medical certificate.  In other words, in both instances, EO 21-058 requires a document with a third-party's imprimatur to qualify for the exception.  Yet, those are not the only opt-outs, given that Section 3 permits employees who do not furnish the COVID-19 vaccination card or document attesting to the beginning or completion of the vaccination process, to hand over on the first day of each week, a negative COVID-19 test result obtained within the previous 72 hours.[24]

For this reason, public employees whose religious beliefs prohibit them from vaccinating need not invoke the religious exception at all and can bypass the sworn declaration requirement by submitting a weekly negative COVID-19 test.[25]  And plaintiffs do not claim that the testing conflicts with a religious practice motivated by a sincerely-held religious belief.  They do not allege that is so, and their testimony confirms it.[26] At bottom, their quarrel is that testing is not free, is not available in the worksite, and is not accessible in their homes given that government does not permit the use of home-testing kits.  Thus, there is no burden on a religious exercise to speak of in order to sustain an RFRA claim.  See, American Life League, 47 F.3d at 654 (given that plaintiffs alleged they did not condone violent conduct, a proscription on violence could not substantially burden their exercise of religion under RFRA).[27]

---

[24] Additionally, as mentioned earlier, Section 3 authorizes use of compensatory time and leaves of absence as alternatives to testing.

[25] The same mechanism applies to employees with a medical exemption.

[26] Ms. Piñero: "I have no objection to getting the test" (Docket No. 100, p. 88); Ms. Ginorio: "Q. Do you refuse to get tested for COVID-19?  A: No." (Docket No. 104, p. 32); Ms. González: "Q. Is testing for COVID-19 against your religious beliefs?"  Yes or No?  A. No" (Docket No. 104, p. 112).

[27] Given this conclusion, there is no need to evaluate plaintiffs' "third-party religious imprimatur" objection to the affidavit requirement.

### iv.   Puerto Rico Constitution

Plaintiffs allege that EO 21-058 violates their dignity and privacy under Article II, §§ 1 and 8 of the Constitution of Puerto Rico (Docket No. 11, pp. 52-53; Docket No. 16, pp. 30-31).   They adduce that the Puerto Rico Supreme Court has held that the scope of a just interpretation of invasion of privacy is very wide, and that for the same reasons that the vaccine mandate violates the Substantive Due Process Clause of the Fourteenth Amendment and RFRA, it runs head-on into the plaintiffs' constitutional right to decisional privacy under the Puerto Rico Constitution (Docket No. 16, p. 31).   They maintain that the exceptions provided by the vaccine mandate- mandatory proof of negative COVID-19 tests financed by them -harms their personal integrity.   Id.   And citing Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35 (1986), they posit that the Puerto Rico Supreme Court "made it clear that 'it is impossible to obtain a really voluntary waiver of the right to privacy, particularly if such waiver becomes a requirement for obtaining a job or for staying in it [as] the risk of losing a job or not getting one, and the worker's position of disadvantage vis-à-vis his employer's impair the possibility of a really free and voluntary waiver'" Id.

Section 1 states that the dignity of the human being is inviolable; all men are equal before the law; no discrimination shall be made on account of race, color, sex, birth, social origin or condition, or pollical or religious ideas; and both the laws and the system of public education shall embody these principles of essential human equality.   See, P.R. Laws Ann. tit. 1, Bill of Rights, Art. II, § 1.   Section 8 provides that every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life.   Id. at § 8.   These rights have "special preeminence" in Puerto Rico's constitutional scheme.   Lozada Tirado v. Testigos de Jehová, 177 D.P.R. 893, P.R. Offic. Trans. at *6 (2010).   But they do not stand in a vacuum.   In their operation, they are "balanced against the legitimate interests [the] employer is seeking to

protect." Congreso de Uniones Industriales de Puerto Rico v Bacardi Corporation, 961 F.Supp.

338, 342 (D.P.R. 1997).

        In Arroyo, 117 D.P.R. at 35, the Puerto Rico Supreme Court held that the employer violated

the employee's right to privacy, dignity and personal integrity when it dismissed him for refusing

to submit to a polygraph test.  Id. at 65-66.  The Supreme Court considered the employer's property

interest as well as the characteristics of the polygraph test, the test's trustworthiness, the potential

for intrusion on the employee's mind, and the employee's inability to prevent the test from

registering his physiological reactions, concluding that the employee's constitutional rights

outweighed the employer's interest in the absence of special circumstances justifying the test such

as grave danger to the social order or any other compelling state interest that could justify testing.

Id. at 61-62.  No one here has required plaintiffs to submit to a degree of intrusion analogous to

what a polygraph test entails.  And contrary to what was the case with the employer in Arroyo, the

record shows EO 21-058 is driven by a compelling interest, with various alternatives to

vaccination.

        In line with Arroyo, the Puerto Rico Supreme Court examined the Commonwealth's

dignity-privacy provisions in Segarra-Hernández v. Royal Bank de Puerto Rico, 145 D.P.R. 178,

203 (1998)).[28]  In Segarra-Hernández, the employee complained about a series of internal transfers

and memoranda that she deemed offensive.  See, Appendix I, at pp. 2-3, 12 (describing factual

setting).  The Supreme Court held that the treatment the employee received did not rise to the level

of a constitutional violation because it did not: involve indiscriminate dissemination of false or

slanderous information; dissemination of private or personal information; limit plaintiff's faculty

---

[28] An English-language translation is included as Appendix I.

to make decisions about her private or family life; or unreasonably impinge on her personal or family tranquility.  Id. at p. 12.

To this end, the memoranda in question looked more like legitimate actions of an employer to improve the operations of one of its departments than like abusive attacks on the personal integrity of an employee.  See, Appendix I, at p. 13.  Further, the fact that the employee's evaluation reflected that she barely met the employer's expectations did not preclude the employer from restructuring its department and from transferring personnel in light of the organization's needs. Id. at 14.  Similarly, the evidence did not reveal anything that could be regarded as insults or humiliations violating constitutional rights.

While on several occasions the Assistant to the Vice-president referred to plaintiff in private conversations as the fat one, the evidence showed the comments merely reflected nonprofessional and morally reprehensible conduct, not conduct that transgressed constitutionally protected limits. See, Appendix I, at p. 13.  This was so, notwithstanding the fact that the employee developed a disabling work-related condition for which she received treatment.  Id. at 15.  In this light, the record did not sustain the allegation that the employer's actions injured plaintiff's "constitutional right to privacy and … right to the protected against abusive attacks on her honor and personal reputation."  Id.  Overall, the employer's actions displayed "legitimate administrative functions." Id.  That is true here as well, given the interest that EO 21-058 seeks to protect.

Following the same balancing approach, in Vega Rodríguez v. Telefónica, 156 D.P.R. 584 (2002), the Supreme Court evaluated the constitutional validity of the employer's practice of videotaping its employees in an open work area not accessible to the public.  Plaintiffs challenged the practice alleging, among other things, that the practice violated the dignity-privacy provisions of the Puerto Rico Constitution.  The Court recognized that employees have privacy rights in the

workplace; that the employer has the right to protect its property; and that a reasonable electronic surveillance system is a legitimate way to protect the employer's property.   Considering the employer (the state-owned telephone company); its compelling interest in security and in achieving an optimal degree of functioning in its communications system; and the particular surveillance system at issue, the Court concluded that the system was not an impermissible intrusion on the employee's privacy.   From the analysis of the controversy, no impermissible intrusion on privacy is present in the case *sub judice.*

In <u>Lozada Tirado</u>, the Supreme Court applied the dignity-privacy provisions of the Constitution, as well as freedom of worship and the liberty component of the Due Process Clause, to declare unconstitutional Section 6 of Law No. 160 of November 17, 2001, pursuant to which a statement of will refusing medical treatment could only be put into effect once the declarant was diagnosed with a terminal health condition or was in a persistent vegetative state and unable to communicate his or her wishes.   <u>See</u>, 177 D.P.R. 893, P.R. Offic. Trans. at 1, 14, 15.   As background, in 2004, the declarant had subscribed before a notary public a document in which, for religious reasons, he expressed his will to refuse, regardless of his health condition, any medical treatment that involved blood transfusions.   <u>See</u>, P.R. Offic. Trans. at 2.   Further, he expressed his wish to have his will respected, and specified that he did not authorize anyone – not even his relatives – to ignore or annul his refusal to receive blood transfusions.   <u>Id</u>.   In 2005, he was involved in a car accident in which he was seriously injured.   <u>Id.</u>   Based on the notarized document, the hospital decided to respect the declarant's will.   <u>Id.</u>

The declarant's wife appeared in court individually and on behalf of her minor son and requested an order to compel the administration of a blood transfusion to her husband, stating that the hospital had refused to administer the transfusion because of the declarant's religious beliefs;

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 58

the blood transfusion was needed to avert his death; and that the court had to issue the order to protect the child's best interests, given that the declarant's income was indispensable to the support of their home and minor child.  See, Lozada Tirado, 177 D.P.R. 893, P.R. Offic. Trans. at 2-3.  The trial court ordered the hospital to administer blood transfusions and dialysis.  Id. at 3.  The intermediate court of appeals affirmed the trial court's ruling, and the Supreme Court reversed the appellate court.  Id. at 18.

The Supreme Court held that the Constitutions of Puerto Rico and of the United States protect the people's right to refuse medical treatment even when that decision may be fatal, based on the principle of inviolability of human dignity, the right to privacy, the due process liberty interest, and in the case under examination, freedom of religion.  See, Lozada Tirado, 177 D.P.R. 893, P.R. Offic. Trans. at 18.  The Court, however, observed that since no right is absolute, once the court ascertains the patient's will, the court must weigh or balance such will against competing state interests of a compelling nature.  Id. at 11-12.  Acknowledging Jacobson, the Court pointed out that those interests include protection of minor children who may be abandoned by the death of their parents, and in having citizens submit to a certain medical treatment during a public health crisis.  Id. at 10, n.13.  Utilizing this framework, the Court concluded that the declarant's decision to refuse treatment had to be respected.  Id. at 16-17.  It balanced the declarant's will against the interests of the minor child, noting that the child could receive some social security benefits in the event that the declarant died, and there was no showing that the child's adult siblings would be unable to help in the child's upbringing.  Id. at 17.

Rounding up this review, in Amadeo Ocasio et. al. v. Pierluisi-Urrutia et. al., Civ. No. SJ 2021 CV04779 (Aug. 6, 2021)(Docket No. 20-2), the Puerto Rico Court of First Instance relied in part on Lozada Tirado to sustain a vaccine mandate on students over age 12, teachers and other

employees of educational institutions.  Id. at 1-3, 30-34.  It noted that the Commonwealth has a compelling interest in: (1) protecting the public's health in light of the emergency caused by the COVID-19 pandemic, (2) reaching herd immunity, and (3) guaranteeing the education of students in the entire educational system of Puerto Rico.  Id. at 31-32.  Further, it observed that together with other measures like the use of masks, washing hands, tests for the non-vaccinated, and physical distancing, the mandate is a necessary measure to advance the State's compelling interests, and there were no more effective or less onerous alternatives to reach the Government's objectives.  Id. at 15, 32.  And it pointed out that the mandate included exemptions for students and employees that could not get vaccinated for documented medical or religious reasons.  Id. at 33.

When all of these authorities are considered, the validity of EO 21-058 is manifest.  As mentioned, it requires vaccination of government employees to curb the spread of COVID-19, a compelling state interest, leaving doors open for opt-outs based on medical, religious, and personal preferences against vaccination.  To maintain active-pay status under the opt-outs the employee must provide a negative test result as indicated in the executive order.  Paid and unpaid leaves of absence are available for those employees that decide not to vaccinate or deliver weekly negative COVID-19 test results.

The vaccination mandate was not the Government's first response to the pandemic. Vaccination started in Puerto Rico in December 2020.  See, https://www.salud.gov.pr/estadisticas_v2#vacunacion (last visited on October 29, 2021).  The mandate became effective on August 15, 2021 (Docket No. 11-1, Section 11, p. 13; Docket No. 51, ¶ 22).  It was the latest in a series of measures put in place during the crisis, including lockdowns, curfews, quarantines, closing of businesses and schools, gathering limits, prohibiting

restaurants and bars from offering dine-in service, use of masks, and requiring facilities to screen

staff and visitors for temperature.[29]  Over time, some of the restrictions were gradually released or

lifted.  Yet, the measures in place were not effective to prevent the increase in cases,

hospitalizations and deaths to which the mandate responded.  On August 30, 2021, the CDC placed

Puerto Rico in Level 4: Very High Level of COVID-19 (Docket No. 51, ¶ 2).

On top of this, Puerto Rico had tried to encourage the population to vaccinate using

educational campaigns and even prizes for vaccination.  See,  https://twitter.com/desaludpr

https://www.protegetevacunate.com/centros-vacunar-te-paga (last visited on October 30, 2021).

General incentives failed to achieve the vaccination rate estimated necessary to halt community

transmission.  As of July 28, 2021, when EO 21-058 was announced, Puerto Rico had 70.2 % of

the eligible population fully vaccinated and 78.5% with one dose, while on August 16, 2021 when

EO 21-058 became effective, 72.3 % of the eligible population was fully vaccinated and 82.2%

had one dose (Docket No. 114, ¶ 3).

With vaccines available, considering the alternatives, the Governor reasonably concluded

that to curb the spread of the virus and its consequences he should add the mandate to the mix of

tools being used to deal with this serious public health problem.  In that sense, like the Court of

First Instance of Puerto Rico recognized in Amadeo Ocasio, Civ. No. SJ 2021 CV04779 (Docket

No. 20-2), there were no more effective or less onerous alternatives for the mandate's enactment

and implementation.  Thus, all things considered, the mandate does not infringe any decisional

---

[29] See, among other Executive Orders ("EOs"), EO 20-023 (March 15, 2020); EO 20-027 (March 15, 2020); EO 20-030 (March 30, 2020); EO 20-031 (April 1, 2020); EO 20-032 (April 1, 2020); EO 20-033 (April 12, 2020); EO 20-034 (April 14, 2020); EO 20-038 (May 3, 2020); EO 20-041 (May 21, 2020); EO 20-046 (June 22, 2020); EO 20-048 (June 29, 2020); EO 20-052 (July 3, 2020); EO 20-054 (July 16, 2020); EO 20-072 (October 16, 2020); EO 20-079 (November 13, 2020); EO 20-080 (November 13, 2020); EO 21-010 (January 5, 2021); EO 21-014 (February 4, 2021); EO 21-019 (March 11, 2021); EO 21-027 (April 15, 2021); 21-028 (April 16, 2021); EO 21-032 (May 6, 2021); EO 210-36 (May 20, 2021); EO 21-037 (May 28, 2021); and EO 21-043 (June 3, 2021).

privacy rights under the Constitution of Puerto Rico.

### (2) Second Prong: Irreparable Injury

EO 21-058 does not call for forced vaccination.  Plaintiffs have options – taking the vaccine; medical, religious or personal-preference exemptions with testing; and paid or unpaid leave of absence.  The court recognizes that for some persons, including plaintiffs, this may be a difficult choice, but a choice nonetheless; a choice within constitutional boundaries.

### (3) Third Prong: Balance of Equities

The balancing of equities requires the court to balance "the hardship that will befall the nonmovant if the injunction issues" with "the hardship that will befall the movant if the injunction does not issue." Mercado-Salinas v. Bart Enterprises International, Ltd., 671 F.3d 12, 19 (1st Cir. 2011); Esso Standard Oil Co. (Puerto Rico). v. Monroig-Zayas, 445 F.3d 13, 17-18 (1st Cir. 2006). Plaintiffs have a liberty interest in refusing unwanted medical treatment.  Forcing them to submit to such treatment may be properly construed as an intrusion on that liberty.  Touching on the harm principle, "the only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others." John Stuart Mill, On Liberty 9 (1859).  If the plaintiffs' decision to refuse the vaccine affected themselves alone, the balance of equities may weigh in their favor.  But they are not the only ones harmed by refusing to get vaccinated.  That refusal could sicken and even kill others "who did not consent to that tradeoff." Cassell, 990 F.3d at 550.  That unwillingness is not a self-contained choice to risk only their own health but bears on the health of other persons.

Beyond that principle, plaintiffs are not being forced to take a vaccine against their will. They have reasonable opt-out options.  The decisions they face may be inconvenient, but that does not tilt the equities in their favor.  As the Sixth Circuit observed in Whitmer, 814 Fed. Appx. at

125, "[enjoining the actions of elected state officials … in a situation where an infectious disease can and has spread rapidly, causes irreparable harm." Id. at 129 (citing Maryland v. King, 567 U.S. 1301 (2012)). In the event the prevalence of COVID-19 pulses up within the community, it puts lives at risk. The balance of equities runs against issuance of a preliminary injunction.

### (4) Fourth Prong: Public Interest

Public interest means "the public's interest in the issuance of the injunction itself." Braintree Laboratories. Inc. v. Citigroup Global Markets Inc., 622 F.3d 36, 45 (1st Cir. 2010); America Cruise Ferries, Inc., 2020 WL 7786939, *15 (D.P.R. December 17, 2020). The Commonwealth is managing an extraordinary array of public health issues and has responded to the challenge based on evolving medical and scientific evidence. Upsetting the careful balance being drawn by the Governor at this time would have an adverse effect on the public interest. So, all things considered, the request for preliminary injunction must be denied.

### B.  Dismissal

The Governor moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Docket No. 20). To survive a motion to dismiss under this rule, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[30] As the discussion above demonstrates, plaintiffs have not stated a plausible claim for violation of the Due

---

[30] In performing this review, the court also considered documents fairly incorporated into the complaint, facts susceptible to judicial notice, documents the authenticity of which are not disputed by the parties and official public records. See, Nieto-Vicenty v. Valledor, 984 F.Supp.2d 17, 20 (D.P.R. 2013)(listing documents court may consider under Rule 12(b)(6)); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)(similar).

Process Clause of the Fourteenth Amendment, the RFRA, or the Constitution of Puerto Rico. EO 21-058 is valid on its face and as applied to each of the plaintiffs' particular situation. On that account, dismissal is appropriate. See, ARJN # 3 v. Cooper, 517 F.Supp.3d 732, 751 (M.D. Tenn. 2021)(dismissing challenge to pandemic-related emergency order under Fed. R. Civ. P. 12(b)(6)); Stewart, 518 F. Supp.3d at 913 (same); Harris, 2021 WL 3848012 at *8 (granting motion to dismiss lawsuit disputing constitutionality of mandatory vaccine policy).

## IV.    CONCLUSION

Just as the law recognizes the right to determine what shall be done with our own bodies, it also recognizes that there are limitations to that right. Among these limits is society's interest in protecting the community's health and safety. That interest is paramount in the current crisis that Puerto Rico, like the United States and the rest of the world, is facing and informs EO 21-058. When the vaccination mandate was adopted and went into effect, less restrictive measures were not being effective in preventing the spread of COVID-19 with attendant hospitalizations and deaths. In this way, the mandate was added to the mix, with opt-outs to accommodate employees who did not wish to vaccinate.

To conclude, having thoroughly studied the pleadings and the record in light of applicable authorities, the preliminary injunction request is DENIED and the case DISMISSED. See, Harris, 2021 WL 3848012 at *8 (denying preliminary injunction in connection with mandatory vaccine policy and dismissing case under Fed.R.Civ. P. 12(b)(6)); America Cruise Ferries, Inc., 2020 WL 7786989 at *1 (denying preliminary injunction in case contesting constitutionality of order suspending maritime passenger and vehicle transportation service in response to COVID-19 pandemic while granting motion to dismiss the case under Fed. R. Civ. P. 12(b)(6)).

Rodriguez Vélez et al. v. Pierluisi-Urrutia
Civil No. 21-1366 (PAD)
Opinion and Order
Page 64

**SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of November, 2021.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO HERNANDEZ
U.S. DISTRICT JUDGE